NATION–WIDE CHECK CORPORA-TION, INC., Plaintiff, Appellee,

v.

FOREST HILLS DISTRIBUTORS, INC., et al., Defendants, Appellants.

NATION–WIDE CHECK CORPORA-TION, INC., Plaintiff, Appellant,

v.

FOREST HILLS DISTRIBUTORS, INC., et al., Defendants, Appellees.

Nos. 82–1281, 82–1285.

United States Court of Appeals, First Circuit.

Argued Sept. 17, 1982.

Decided Nov. 15, 1982.

Ivor C. Armistead, III, with whom Daniel S. Margolies, and Widett, Slater & Gold-

man, P.C., Boston, Mass., were on brief, for defendants Forest Hills Distributors, Inc., et al.

John Wall, with whom Cullen & Wall, and Harry C. Mezer, Boston, Mass., were on brief, for plaintiff Nation-Wide Check Corp.

Before DAVIS[*], CAMPBELL and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Appellants Joseph Braunstein, Stephen Gordon, and Victor Dahar (the "assignees") are assignees for the benefit of creditors of Forest Hills Distributors, Inc., and Forest Hills of New Hampshire, Inc. ("Forest Hills"). Appellee Nation-Wide Check Corporation ("Nation-Wide") sells money orders. Forest Hills sold Nation-Wide's money orders on Nation-Wide's behalf. After Forest Hills assigned its assets for the benefit of its creditors, Nation-Wide sued the assignees for the proceeds of the money order sales. The district court found in its favor. The assignees appeal, claiming that the court rested its decision in part upon an impermissible inference based upon the fact that the assignees allowed the destruction of certain Forest Hills documents in their possession. We believe the district court's inference was permissible, and we therefore affirm its decision.

## I

In October 1973 Nation-Wide agreed with Forest Hills that Forest Hills would sell Nation-Wide's money orders to the public in return for a commission. The agreement specifically provided that Forest Hills would hold the sale proceeds apart from all its other assets and revenues, depositing those proceeds in a separate account with The First National Bank of Boston. This procedure, however, was not followed. Instead, the proceeds were deposited in various Forest Hills accounts in local banks near Forest Hills' stores, then transferred to various other Forest Hills accounts in Boston banks. From there, Forest Hills periodically remitted amounts due to Na-

tion-Wide. Moreover, the proceeds were commingled with general Forest Hills revenues when they reached the Boston banks.

In late 1974 Forest Hills encountered financial difficulties and stopped sending money order proceeds to Nation-Wide. On December 18, Forest Hills executed an assignment of all its assets for the benefit of its creditors. At the time of the assignment, Forest Hills owed Nation-Wide $71,417.69 for money orders issued between early November (when Forest Hills stopped paying Nation-Wide) and December 18 (when the assignment took place and money order sales were halted).

The assignees quickly liquidated most of Forest Hills' assets. By the end of December 1974 they apparently accumulated a fund of more than $600,000. Nation-Wide with equal promptness told the assignees about its claim against Forest Hills. Nation-Wide said that its claim took precedence over the claims of Forest Hills' general unsecured creditors because of the "separate-fund" provisions in its 1973 money order agreement. Nation-Wide's lawyers spoke to assignee Gordon around December 19 and wrote to Gordon about their claim a few days later. The assignees rejected Nation-Wide's priority claim and Nation-Wide filed suit against the assignees and Forest Hills on April 1, 1975, seeking payment of its $71,000 out of the $600,000 the assignees had accumulated.

On April 11, Gordon, an associate in a Boston law firm, wrote a letter to a senior partner in the same office about Forest Hills' business records. He noted that the records were being stored at some expense and asked if they should be discarded. In accordance with advice he received from the firm's partner, he then abandoned many of the documents—including all 1974 checks—to the landlord of the storage premises. Gordon's act of abandonment lies at the center of the controversy on this appeal.

In August 1979, when denying cross motions for summary judgment, the district

---

[*] Of the Federal Circuit, sitting by designation.

court made clear just what Nation-Wide would have to prove to establish a preferred position vis-a-vis the general creditors and thereby to prevail. First, Nation-Wide would have to prove that Forest Hills breached a specific agreement to keep the money order sale proceeds separate. At that point Nation-Wide's claim would be like that of a secured creditor or a beneficiary of a trust, whose property the debtor or trustee has commingled with other property of his own. *See In re Dexter Buick-GMC Truck Co.,* 2 B.R. 247, 250 (Bkrtcy.D. R.I.1980). Second, Nation-Wide would then have to trace the funds from the sales themselves into the final $600,000 accumulated by the assignees.

The first of these tasks was easy; the second was not quite as difficult as it sounds, for Nation-Wide, like a trust beneficiary seeking recovery from a "commingling" trustee, would benefit from liberal common law tracing presumptions. *See* 5 A. Scott, *The Law of Trusts* § 517, at 3620–21 (1967) [hereinafter cited as *Scott on Trusts*]. The district court found applicable, for example, the rule that when a trustee withdraws funds for his own purposes from a commingled account, he is presumed to have withdrawn his own money first. *See, e.g., Farinha v. Commissioner of Banks,* 303 Mass. 192, 21 N.E.2d 237 (1939); *Bogert on Trust and Trustees* § 926, at 407–08 (2d rev. ed. 1982); *Scott on Trusts* § 517. The effect of this presumption is to allow the beneficiary to recover the full value of the trust res from the commingled fund as long as the fund's value has never dipped below that of the trust res itself. Thus, if a trustee deposits ten dollars of his own money and ten dollars of trust money in a single account, and withdraws five dollars from the account subsequently, the withdrawal is treated as being taken entirely from the trustee's own money, and the beneficiary can recover the entire ten dollars from the balance. If the balance of the account were to dip below ten dollars on the other hand, the beneficiary would be entitled only to the "lowest intermediate balance." *See Universal C.I.T. Credit Corp. v. Farmers Bank,* 358 F.Supp. 317, 325–26 (E.D.Mo.1973); *Scott on Trusts* § 517; 1 G.

Palmer, *The Law of Restitution* § 2.16, at 199 (1978).

We suspect, but do not decide, that the district court might have used other liberal presumptions as well, although there is no specific indication that it did so. For example, if a trustee commingles trust funds with other funds, then withdraws part of the commingled fund and preserves it but dissipates the balance, the trust attaches to the preserved fund despite the fact that it was the first sum withdrawn and hence would otherwise be considered the trustee's money under the first presumption. *See Scott on Trusts* § 517.1. Under this presumption, if the trustee withdraws ten dollars from a commingled fund and uses it to buy a watch, or simply places it in another account, and then dissipates the balance of the commingled fund on other personal expenses, the beneficiary can recover against the watch or the new account rather than being consigned to the status of general creditor because the first account is empty.

In any event, we believe the court was operating on the assumption that, if Nation-Wide could demonstrate that the balances in the various bank accounts into which Forest Hills directly placed, or transferred, money order proceeds never declined below the level of the money order proceeds placed in them, it could recover the whole amount of the proceeds. More realistically, even if any local account did decline below the level of the proceeds placed in it, Nation-Wide might still recover the full amount, by showing that the shortfall was accounted for by a transfer to another account that did not itself subsequently fall below the required level and that reached the assignees. If it were able to produce records of inter-account transfers and account balances for the relevant period, Nation-Wide could effectively "trace" all of the proceeds from the initial sales through Forest Hills' various bank accounts into the hands of the trustees.

At trial, Nation-Wide was able to present only limited evidence of the money order proceeds' "path" through Forest Hills' various accounts—in part because it had no recourse to the documents that Gordon discarded, in part because most of the banks

involved had scanty records or no records at all. Nation-Wide produced records of the dates, locations, and amounts of money order sales for the relevant period, along with testimony that the proceeds were systematically deposited within a relatively short time by each local Forest Hills' store in a local bank. Nation-Wide also produced a list of the local bank accounts in both Massachusetts and New Hampshire and a compilation of the statements of those accounts in Massachusetts indicating that the aggregate balance for the period was always roughly equal to or substantially above the level of proceeds from all stores. Finally, it showed that the assignees deposited over $450,000 of Forest Hills' money in a new account within twelve days of the assignment, although it was unable (with one exception) to prove where the money came from.

While this evidence was consistent with the final accumulated fund containing proceeds of the original sales, in only one case did Nation-Wide produce conclusive documentary evidence of the route of the proceeds—a transfer of $1,204.85 from the Seabrook, New Hampshire, store, through the Hampton National Bank and the New England Merchants' Bank, into the assignees' First National Bank of Boston account. The court found that the movement of funds from the Seabrook store was "typical" of the movement of funds from other stores, but Nation-Wide was unable to introduce parallel documentation to trace the balance of the proceeds from other accounts.

The district court filled this evidentiary gap by drawing an inference from the destruction of Forest Hills' business records by Gordon. The court found that Gordon had known as early as December 1974, from his communications with Nation-Wide's attorney, that the business records might be needed to trace the money order funds into the hands of the assignees. The court concluded that while Gordon had not acted in actual bad faith, he had "intentionally discarded" the documents "in knowing disregard of the plaintiff's claims," and that it was therefore proper to infer that the documents would have allowed Nation-Wide to

trace the balance of the money order proceeds into the hands of the assignees.

The most recent authority in this circuit on the inferences to be drawn from the destruction of documents is *Allen Pen v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir.1981). *Allen Pen* held that without some evidence that documents have been destroyed "in bad faith" or "from the consciousness of a weak case," it is "ordinarily" improper to draw an adverse inference about the contents of the documents. 653 F.2d at 23–24. The district court expressly found that Gordon did not act in bad faith, not because it believed that Gordon's behavior was in any sense proper, but because it felt that Gordon, as an assignee for the benefit of creditors, had no direct stake in the disposition of Forest Hills' assets among the claimants. However, the court did not interpret *Allen Pen* as establishing a *per se* requirement that bad faith be found before an adverse inference is drawn. It concluded that the inference was proper in this case because Gordon's conduct was not merely negligent but "purposeful" and "in knowing disregard" of Nation-Wide's claim. Unless an adverse inference were drawn, the court feared that other assignees might act like Gordon; they would be encouraged to destroy relevant documents and claimants in Nation-Wide's position would be denied their rightful property.

## II

The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him. Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists:

The failure or refusal to produce a relevant document, or the destruction of it, is evidence *from which alone* its contents

may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.

2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979) (emphasis added). The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them.

The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. The fact of destruction satisfies the minimum requirement of relevance: it has some tendency, however small, to make the existence of a fact at issue more probable than it would otherwise be. *See* Fed.R.Evid. 401. Precisely how the document might have aided the party's adversary, and what evidentiary shortfalls its destruction may be taken to redeem, will depend on the particular facts of each case, but the general evidentiary rationale for the inference is clear.

The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. The inference also serves as a penalty, placing the risk of an erroneous judgment on the party that wrongfully created the risk. In McCormick's words, "the real underpinning of the rule of admissibility [may be] a desire to impose swift punishment, with a certain poetic justice, rather than concern over niceties of proof." *McCormick on Evidence* § 273, at 661 (1972).

That this policy rationale goes beyond a mere determination of relevance has been clear from the beginning. In the famous case of *Armory v. Delamirie,* 1 Stra. 505, 93 Eng.Rep. 664 (K.B.1722), the chimney sweep who sued the jeweler for return of the jewel he had found and left with the jeweler, was allowed to infer from the fact that the jeweler did not return the jewel that it was a stone "of the finest water." Were relevance all that was at issue, the inference would not necessarily be that the jewel was "of the *finest* water"; the fact that the jeweler kept the jewel proved that the jewel had value, but it did not prove the value of the jewel. Nonetheless, the judge instructed the jury to "presume the strongest against him, and make the value of the *best* jewels the measure of their damages" —a clear sign that the inference was designed to serve a prophylactic and punitive purpose and not simply to reflect relevance.

In this case, both the evidentiary and the policy rationales support the inference drawn by the district court. It is important as an initial matter to recall how much Nation-Wide had shown, directly or indirectly, without resort to the inference. It had established the precise dates and amounts of the money orders and the probable initial route of the proceeds into the local accounts. It had shown that at least some of the Massachusetts accounts had sufficient balances at all relevant times to cover the proceeds. Although it was unable to introduce cancelled checks or other records to trace most inter-account transfers, it was able to do so with regard to the Seabrook proceeds, and the court found that the flow of money from the Seabrook store's local account to the central accounts was "typical" of the flows from the other stores. Finally, it showed that some $88,-000 came into the assignees' hands from a specific Forest Hills central account, and while it could not prove where the rest of the money collected by the assignees came from, it was not unreasonable to assume that some portion of it came from other Forest Hills accounts. In short, even without the inference from the destruction of the records, the court had significant circumstantial evidence that the proceeds were not dissipated before they could reach the assignees. The issue before the court

was not whether the destruction was sufficient, standing alone, to warrant an adverse inference about the documents' contents; it was simply whether the destruction was at all relevant to the tracing issue, and if so, whether it was sufficiently probative in conjunction with the other evidence to support the tracing conclusion.

That the destruction was relevant is clear. As the district court found, Gordon had notice that the documents might be necessary to Nation-Wide's claim at the time he destroyed them. The assignees argue to the contrary on appeal, but there is sufficient evidence in the record to support the court's finding that Gordon was put on notice as early as late December 1974, four months before he destroyed the documents, by his communications with Nation-Wide's attorney. More importantly, the court found that Gordon's conduct transcended mere negligence and amounted to "knowing disregard" of Nation-Wide's claim. The court's reluctance to label Gordon's conduct as "bad faith" is not dispositive: "bad faith" is not a talisman, as *Allen Pen* itself made clear when it stated that the adverse inference "ordinarily" depended on a showing of bad faith. Indeed, the "bad faith" label is more useful to summarize the conclusion that an adverse inference is permissible than it is actually to reach the conclusion. Here, although the court found that Gordon might not have been "completely aware" of the significance of the records, he proceeded to destroy them without further inquiry even though they theoretically could have disproven as well as proven Nation-Wide's tracing claim. This conscious abandonment of potentially useful evidence is, at a minimum, an indication that Gordon believed the records would not *help* his side of the case—by proving, through the checks written, for example, that the accumulated funds could not contain the sale proceeds. In turn, such a belief by an assignee who was presumably familiar with records that included all 1974 checks, who knew of the assignee's denial of Nation-Wide's claim, and who knew of Nation-Wide's suit against him, is some (though perhaps weak) evidence that the records would have helped Nation-Wide.

Once this minimum link of relevance is established, however, we believe that the district court has some discretion in determining how much weight to give the document destruction, and prophylactic and punitive considerations may appropriately be taken into account. The court did consider the innocuous reason that Gordon claimed had led to his discarding the records—avoiding storage costs. The court also took account of the fact that an assignee ordinarily is supposed to be "neutral" as among claimants and thus would not wish to destroy evidence that would support a meritorious claim. It is also true that Gordon did not "destroy" the documents in an orthodox sense; he simply left them for the landlord to destroy.

While these considerations arguably reduce the probative value of Gordon's acts, they do not destroy the relevance of the acts altogether. Gordon's letter to his partners could be seen as self-serving. His neutrality also can be called into question, both because he had been made an assignee by the general creditors rather than by Nation-Wide, and because he was a defendant in Nation-Wide's suit. Moreover, while the mitigating circumstances surrounding Gordon's conduct might provide a basis for tempering a prophylactic or punitive use of the inference, the court was entitled to consider countervailing factors. Among these were the improper nature of Gordon's conduct, the desirability of deterring other assignees from engaging in similarly reckless behavior, and the extent to which fairness dictates making the assignees, rather than Nation-Wide, bear the financial risks arising from document loss. The court could also take into account the other evidence tending to show that the money flows satisfied the "tracing" requirements and reasonably conclude that the evidentiary gap was not a large one. Taking these matters into account, the district court decided to give the act of document destruction sufficient weight to satisfy, in context, the tracing burden the law imposed upon Nation-Wide. Given that the act of destruction was logically connected to the ultimate fact proved and that the policy considerations militated in favor of according

that act significant weight, we believe the district court's decision was reasonable and within its discretion.

We note that Nation-Wide has cross-appealed on the ground that the district court erred in denying it attorney's fees and awarding it pre-judgment interest under the statutory provisions for tort actions. The district court's reasoning in rejecting Nation-Wide's requests below is entirely unobjectionable, and Nation-Wide has not bothered to present the case for its position either in its brief or at oral argument other than by making the contention (which we have rejected) that Gordon should be found to have acted in bad faith. We see no reason to upset the district court's judgment in this respect.

The decision of the district court is

*Affirmed.*