Myla KELLEY, Daniel Kelley, Plaintiffs,

v.

UNITED AIRLINES, INC., Andy Frain Aviation Services, Inc., Defendants.

No. Civ. A. 94–11803–MLW.

United States District Court, D. Massachusetts.

Dec. 9, 1997.

Sean P. Teehan, Murphy and Beane, Boston, MA, for Plaintiffs.

Wayne C. Kerchner, Meehan, Boyle & Cohen, P.C., Boston, MA, for United Airlines, Inc.

Wayne C. Kerchner, Meehan, Boyle & Cohen, P.C., Christopher A. Duggan, Smith, Duggan & Johnson, Boston, MA, for Andy Frain Aviation Services, Inc.

1. An aisle chair is a narrow wheelchair used to transport physically handicapped persons onto

*MEMORANDUM AND ORDER ON THE PLAINTIFFS', MYLA KELLEY AND DANIEL KELLEY, MOTION FOR SANCTIONS (# 42)*

COLLINGS, United States Magistrate Judge.

### I. Introduction

In their complaint, plaintiffs Myla and Daniel Kelley, husband and wife, allege that on or before August 7, 1992 they had purchased round trip airline tickets between Boston, Massachusetts and Denver, Colorado on defendant United Airlines, Inc. ("United"). Consequent to being handicapped, Myla Kelley required wheelchair accommodation when boarding or deplaning aircraft, and had so advised the airline. It is alleged that Mrs. Kelley was injured while being boarded on a United plane at Denver's Stapleton International Airport on August 11, 1992. Specifically, it is asserted that Myla Kelley was either dropped or fell from the wheelchair/aisle chair [1] used to access the aircraft resulting in serious injury to her person.

Presently before the Court for decision is the plaintiffs' motion for sanctions due to spoliation of evidence. The Kelleys contend that United destroyed, or permitted to be destroyed, certain documentary evidence that would have proven whether it was employees of United or those of the other defendant, Andy Frain Aviation Services, Inc. ("Andy Frain"), who were assisting Mrs. Kelley enplane in Denver, as well as the precise identity of those workers. Further, this spoliated evidence may also have established the maintenance, condition and whereabouts of the subject aisle chair. The plaintiffs claim to have been irreparably harmed by the destruction of this documentary evidence and thus seek sanctions against United. The requested sanctions are, alternatively, that judgment be entered in favor of the plaintiffs on liability, or that United be barred from

raising any defense or introducing evidence in support of any defense by asserting that wheelchair/aislechair service was

aircraft.

provided to the Plaintiff, Myla Kelley, by another party and/or independent contractor and any defense that the aisle chair in question was properly maintained and in good condition prior to and at the time of the incident of August 11, 1992.

The Plaintiffs', Myla Kelley and Daniel Kelley, Motion for Sanctions # 42 at 1.

Needless to say, United opposes the plaintiffs' motion in toto, including the relief sought.

### II. The Facts

The facts as here recited have been gleaned extensively from the documentary evidence submitted by the parties and are essentially undisputed. Seven days after his wife's fall from the aisle chair, on or about August 18, 1992, Daniel Kelley sent a letter to United in part stating:

I am writing this letter on behalf of my wife, Myla E. Kelley, who is presently recuperating from an injury she sustained while boarding your flight # 352 from Denver to Boston, on August 11, 1992 at approximately 10:20 a.m.

Her injuries were the result of faulty equipment, untrained staff and a general lack of concern for the handicapped.

* * *

The injury was incurred on our return flight, arriving at the Denver airport in plenty of time. We stood by for boarding. When early boarding was called, we went to the gate, but we were told we would have to wait since there was no aisle chair/transporter available.

After waiting 10 to 15 minutes, we were told to proceed to the plane. There were two young men at the plane door with an aisle transporter. The area was crowded, requiring the young men to clear an area to transfer my wife to the transporter. Once that was accomplished, we transferred her to the aisle transporter. Here the young men had problems with the safety straps and securing my wife. After a while, it seemed that she was secure and ready to board.

Just as she boarded the plane, the transporter hit something and my wife was thrown from the transporter hitting the bulkhead between First Class and Coach. She hit head first and was stunned for a while. Both the handling attendants and the flight crew did nothing initially.

* * *

It is no wonder that our society has become so litigious. Surely, in part, it reflects upon the lack of caring on the part of people such as your flight crew, management and airport staff. This is why we need laws to protect the well-being and rights of the handicapped.

Since it is too early to determine the full impact of my wife's fall, we are requesting a copy of the report filed by the flight crew and any other reports that may have been filed relative to the incident outlined herein. Your prompt attention to this matter will be appreciated.

Appendix of Exhibits # 44, Exh. A.

By letter dated September 4, 1992, Ruth Bartkus of the executive offices of United[2] responded to Mr. Kelley's letter, writing in pertinent part:

Please be assured that an investigation has been initiated into this incident, and we expect to receive those reports in the near future. In the meantime, your correspondence has been forwarded to our representatives, Associated Aviation Underwriters. They have been requested to contact you promptly regarding this matter.

Appendix of Exhibits # 44, Exh. B.

Indeed, a claims attorney from Associated Aviation Underwriters ("AAU") corresponded with Mr. Kelley on or about September 16, 1992, advising that:

We are the Underwriters for United Airlines, and, as such, your claim has been forwarded to this office for handling.

Please advise as to the complete facts of this incident so that we may investigate. In the meantime, please send us, without prejudice, a copy of all medical reports and

---

**2.** According to her affidavit, Ruth Bartkus is employed in the legal department of United at its corporate headquarters, but is not herself an attorney.

bills pertaining to your wife's injuries. Moreover, please include copies of your wife's boarding pass and ticket for the flight in question. Please advise if you are claiming other items of special damage. Finally, please describe or identify any witnesses to this incident.

Upon receipt of the requested information and completion of an investigation, we will be able to consider your claim.

Appendix of Exhibits # 44, Exh. D.

According to Ruth Bartkus, upon receipt of Daniel Kelley's August 18th letter, she contacted the in-flight offices at the airports where the flight attendants on flight # 352 were based because usually if a report about an incident is completed by a flight attendant, it is filed with the attendant's supervisor at his or her home base. Ms. Bartkus avers that:

This is the method I have routinely used since before 1992 to the present time [October 30, 1996] to locate flight attendant reports, and ordinarily any reports that have been prepared are located and sent to me using this procedure. No report of the incident was located, and United's insurer was informed of the fact that no report had been located. Had any report of any kind concerning the incident been located, it would have been sent to United's insurer at that time.

United Airline, Inc.'s Opposition # 54, Exh. 2.

Thereafter in October of 1992, Ms. Bartkus states that she attempted to contact the person designated as the first flight attendant on flight # 352, a person who, as the lead flight attendant, usually would have knowledge of any untoward events that had occurred. The information received by Ms. Bartkus was that the first flight attendant "did not recall or know anything about the incident, but that if she did recall anything about the incident, she would let me know as soon as possible." (# 54, Exh. 2) According to Ms. Bartkus, no further information was ever

forthcoming from the first flight attendant. (*Id.*)

In fact it appears that one of the flight attendants, Mary Gill–Ludwig, had filed an unusual incidents report dated 8/11/92 wherein she related the following events:

While boarding flt. 352 a lady was transferred from a wheelchair to an asile (sic) chair by security employees. The lady was traveling with her husband.

Several passengers were in front of the asile (sic) chair and behind. The lady was being brought on board when she felled (sic) out of the chair! She landed on the floor and next to the jumpseat. I looked up and saw the chair empty, upright and the seatbelt was hanging from the chair loosely!

Appendix of Exhibits # 48, Exh. D.

This report was ultimately found at the Denver in-flight office in July of 1995 approximately one year after this litigation was instituted during a third attempt by Ruth Bartkus to determine if any flight attendant reports had been filed with respect to the August 1992 incident.[3] (# 54, Exh. 2)

By letter dated October 2, 1992, Edward J. Murphy, Esquire, of the law firm of Murphy and Beane wrote to claims attorney Donald P. Smith, Esquire, of AAU to advise that he represented Myla Kelley with regard to the injuries that she had sustained while being boarded on the United flight two months earlier. (# 44, Exh. E) In response to AAU's earlier request, Attorney Murphy enclosed a copy of Mrs. Kelley's boarding pass and ticket for flight # 352, and also once again asked that a copy of the accident report prepared by United be sent. (# 44, Exh. E) Sean P. Teehan, Esquire, of Murphy and Beane forwarded copies of Myla Kelley's medical records to Attorney Smith with a cover letter dated January 27, 1994.[4] (# 44, Exh. F) Subsequent to an ensuing conversation Attorney Smith wrote a letter to Attorney Teehan on April 21, 1994, wherein he questioned the

**3.** According to Ms. Bartkus' affidavit, "[b]ased on my experience in requesting and obtaining flight attendant reports, it is very unusual for such reports to be misfiled, misplaced, or inadvertently missed when a search is made for them." United Airlines, Inc.'s Opposition # 54, Exh. 2.

**4.** The text of this letter reflects that the attorneys had been in communication. (# 44, Exh. F)

causal connection between the fall from the aisle chair and Mrs. Kelley's medical conditions and, in order to more fully review the matter, requested additional medical reports. (# 44, Exh. G)

Ten days later, on or about May 31, 1994, Attorney Teehan sent a twelve page, formal demand letter to AAU enclosing "all relevant medical reports, records and bills for professional medical services" arising out of the August 11, 1992 incident, recounting the facts allegedly underlying United's liability and detailing the damages sought by the Kelleys. (# 44, Exh. H) Attorney Smith acknowledged receipt of these materials in a June 16, 1994 letter to Attorney Teehan, but noted that as a consequence of a purported discrepancy in the rendition of events given in the May 31st letter and that given by Mr. Kelley in his August 18, 1992, he would be referring the letter to United for guidance as to further action. (# 44, Exh. I) Thereafter, in a letter dated July 7, 1994, Attorney Smith wrote as follows to Attorney Teehan:

> In response to my previous letter and our telephone conversations on this matter I contacted our insured concerning your allegations. As United has no substantiation of this matter and their wheelchair provisioning is done by an outside agency (specifically the Andy Frain Company), I suggest your claim would be better directed towards the Frain organization....

Appendix of Exhibits # 44, Exh. J.

On July 29, 1994, Myla and Daniel Kelley filed suit against United and Andy Frain.

### III. The Motion

In order to put the spoliation issue in context, slightly different background facts need to be expounded. In their complaint, among other things the Kelleys alleged that:

13. On or about August 13, 1992, the Defendant, United Airlines, Inc., its agents, servants and employees, breached their duty to provide Myla Kelley reasonable safety and comfort during and between her flights by acting in a negligent manner in the provision of wheelchair services and handicapped access services to the plane.

14. The Defendant, United Airlines, Inc., its agents, servants and employees, acted negligently in their operation, maintenance, control, inspection, care and supervision of their wheelchair services and handicapped access services.

Complaint and Jury Trial Demand # 1.

In addition to specifically denying those particular allegations, United interposed the following as its Fourth Affirmative Defense:

> And further answering, Defendant United states that the conduct, acts and/or omissions of which the Plaintiffs complain were the conduct, acts and/or omissions of another and that Defendant United does not have responsibility for same.

Defendant United Airlines, Inc.'s Answer # 3.

Similarly, in answer to interrogatories United responded "that because employees of Andy Frain Aviation Services, Inc. provided wheelchair service to Myla Kelley, if there was any negligence in connection with the provision of such services by Andy Frain personnel, Andy Frain and not United is liable for same." (# 44, Exh. M)

As the litigation progressed, the deposition of John Scot Thaxton, United's supervisor of customer service at the Denver Airport from 1987 through September, 1992, was taken; his affidavit was also submitted in opposition to the plaintiffs' motion. (# 48, Exh. E; # 54, Exh. 1) According to Mr. Thaxton:

> \* \* \*

> As part of my duties, I was designated by United to act as the contact person between United and Andy Frain Aviation Services, Inc., the company which had a contract with United to serve as a [sic] independent contractor to provide special services, including performance of wheelchair and aisle chair services, at Stapleton Airport.

> \* \* \*

United Airlines, Inc.'s Opposition # 54, Exh. 1.

Mr. Thaxton testified that pursuant to the terms of the contract between them, Andy Frain was to provide to United " 'a complete copy of all daily employee sign-in registers

listing each working employee by name, date and number of hours worked' " on a biweekly basis. (# 48, Exh. E at 158–160) Those documents were kept for one year and then destroyed. (*Id.* at 161) Similarly, although daily and quarterly inspection and maintenance reports for wheelchairs and aisle chairs were maintained under Mr. Thaxton's direction, those documents too were destroyed after a one year period pursuant to the document retention policy. (# 48, Exh. E at 88–92, 102–03, 125–8) In his affidavit, Mr. Thaxton explained United's written policy for record retention, and appended a copy of it. (# 54, Exh. 1) In particular, he notes that:

> Pursuant to this suggested schedule, invoices, requisitions and supporting documentation were retained by United at Stapleton International Airport for a year and then discarded in the usual course of business, including invoices and requisitions relating to the wheelchair and aisle chair services performed by Andy Frain Aviation Services, Inc. and the maintenance and repair of wheelchairs and aisle chairs by an outside contractor.

United Airlines, Inc.'s Opposition # 54, Exh. 1.

During the course of discovery, the Kelleys requested the production of any and all documents relating the condition and maintenance of the subject aisle chair, as well as any and all documents relating to the identity of the wheelchair attendants on duty August 11, 1992. It was at that time that the plaintiffs learned that any such documents had been destroyed pursuant to United's document retention policy, and it is that destruction which serves as the foundation for the motion for sanctions.

## IV. Discussion

■ The Kelleys assert that United acted in bad faith by knowingly and willfully destroying documentary evidence that was crucial to the plaintiffs' case and therefore should be sanctioned. Despite a lengthy exposition of the facts and circumstances of this case, however, there quite simply is no evidence to suggest that there was any bad faith involved. The facts, for instance, that the documentary evidence was extremely important to the Kelleys' case, or that United was aware a claim was being advanced by Myla Kelley at the time the destruction occurred is not enough to establish bad faith.[5]

This conclusion alone, however, is not dispositive of the motion. The First Circuit has had occasion to note that

> Certainly bad faith is a proper and important consideration in deciding whether and how to sanction conduct resulting in the destruction of evidence. But bad faith is not essential. If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of evidence.

*Sacramona v. Bridgestone/Firestone, Inc.,* 106 F.3d 444, 447 (1 Cir., 1997) (citations omitted).

The rule in the First Circuit is that

> When a document relevant to an issue in a case is destroyed, the trier of fact sometimes may infer that the party who obliterated it did so out of a realization that the contents were unfavorable. *See Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217 (1st Cir.1982); *see also* 2 Wigmore on Evidence § 285, at 192 (James H. Chadbourn rev. ed.1979). Before such an inference may be drawn, there must be a sufficient foundational showing that the party who destroyed the document had notice both of the potential claim and of the document's potential relevance. *See Nation–Wide,* 692 F.2d at 218. Even then, the adverse inference is permissive, not mandatory. If, for example, the factfinder believes that the documents were destroyed accidently or for an innocent reason, then the factfinder is free to reject the inference. *See, e.g., Jackson v. Harvard Univ.,* 900 F.2d 464, 469 (1st. Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990); *Anderson v.*

---

**5.** It is noted that Mr. Thaxton and Ms. Bartkus both state that they neither asked any United employees to destroy records, nor to their knowledge did any employees deliberately do so in order not to provide the information. (# 54, Exh. 1,2)

*Cryovac, Inc.,* 862 F.2d 910, 925–26 (1st Cir .1988).

\* \* \*

When evidence indicates that a party is aware of circumstances that are likely to give rise to future litigation and yet destroys potentially relevant records without a particularized inquiry, a factfinder may reasonably infer that the party probably did so because the records would harm its case. *See Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995); *Partington v. Broyhill Furniture Indus., Inc.,* 999 F.2d 269, 272 (7th Cir.1993); *Nation–Wide,* 692 F.2d at 219.

*Blinzler v. Marriott International, Inc.,* 81 F.3d 1148, 1158–59 (1 Cir., 1996).

■ The defendant's protestations notwithstanding, there can be little doubt that Mr. Kelley's letter written one week after the incident constituted a claim. Indeed, United treated it as such, stating that an investigation would be launched and forwarding the letter to its insurance carrier. Then, less than two months after the troubled boarding on flight # 352, a lawyer representing the Kelleys was corresponding with a claims attorney at AAU representing the defendant. At a minimum, this conduct all within a very short time period reflects United's perception that Mrs. Kelley's fall was likely to lead to a claim being made and, potentially, litigation.

While Ms. Bartkus may have followed her regular routine in searching for incident reports, the adequacy of that "investigation" is somewhat questionable given that just such a report was discovered where it should have been located years earlier. Further, from all that appears, AAU relied solely upon the search conducted by the non-lawyer at United. There has been nothing proffered to intimate that AAU undertook any type of independent investigation. Moreover, what is not discussed at all is any effort made to secure the records maintained under Mr. Thaxton's jurisdiction. These records were

plainly relevant both with respect to the condition and maintenance of the aisle chair, as well as the identity of the employees involved in the incident. While the destruction of these various records may have been undertaken in the normal course, it was negligent not to have searched for the relevant documents and preserved them.

Having considered and weighed all of the circumstances at hand, I find that there has been no conduct so egregious as to warrant the entry of judgment on liability in favor of the plaintiffs.[6] That is not to say, however, that a more limited sanction is not justified. In an exercise of my discretion, I will at trial permit the plaintiffs to lay the foundation which will entitle them to an instruction on a permissive adverse inference against United without respect to the destruction of the documents.

### V. Conclusion

For all the reasons stated, it is ORDERED that The Plaintiffs', Myla Kelley and Daniel Kelley, Motion For Sanctions (# 42) be, and the same hereby is ALLOWED to the extent that the plaintiffs will be permitted to lay the foundation which will entitle them to an instruction on a permissive adverse inference against United with respect to the destruction of the documents. It is FURTHER ORDERED that said motion be, and the same hereby is, otherwise DENIED.

---

6. The plaintiffs alternatively seek the imposition of a sanction in the form of an order barring United from raising its Fourth Affirmative Defense and submitting evidence in support of it; the Court need not determine whether such a sanction is appropriate since in a separate Memorandum and Order entered this date, I have struck that defense as insufficient as a matter of law on the facts on this case.