278 F.3d 54
 Mary Ester MACFARLANE, individually and as Administrator of the Estate of D. Kenneth Macfarlane, Patrick Macfarlane, Scott Macfarlane, Christopher Macfarlane and Kelly Gill, Plaintiffs-Appellants,
v.
CANADIAN PACIFIC RAILWAY COMPANY as Successor in Interest to FKA Delaware and Hudson Railroad Co., Inc. and National Railroad Passenger Corporation d/b/a Amtrak, Defendants-Appellees.
 Docket No. 01-7083.
 United States Court of Appeals, Second Circuit.
 Argued November 13, 2001.
 Decided January 2, 2002.
 
 Kaveh S. Shahi, Rutland, VT (Cleary Shahi Associates, P.C.), for Plaintiffs-Appellants Mary Ester Macfarlane, Patrick Macfarlane, Scott Macfarlane, Christopher Macfarlane and Kelly Gill.
 Craig Weatherly, Burlington, VT (Gravel and Shea), for Defendants-Appellees Canadian Pacific Railway Company and National Railroad Passenger Corporation d/b/a Amtrak.
 Before: FEINBERG, CARDAMONE, and POOLER, Circuit Judges.
 FEINBERG, Circuit Judge.
 
 
 1
 This appeal arises out of a wrongful death action brought by Mary Ester Macfarlane (the widow of D. Kenneth Macfarlane), individually and as administrator of the estate of D. Kenneth Macfarlane, and her children (collectively Macfarlane) against National Railroad Passenger Corporation (Amtrak) and Canadian Pacific Railway Company (Canadian Pacific), for damages caused by a collision between an Amtrak passenger train and a pick-up truck in which D. Kenneth Macfarlane was a passenger. Amtrak is a federally-chartered not-for-profit corporation with its principal place of business and citizenship in Washington D.C.[1]
 
 
 2
 Plaintiff Macfarlane asks us to review two orders of the United States District Court for the District of Vermont, William K. Sessions III, J. The first granted partial summary judgment to defendant Amtrak on plaintiff's claim that, under the factual circumstances here, the Amtrak train was proceeding at an excessive speed when the accident occurred. The district court held that this claim was pre-empted by the Federal Railway Safety Act of 1970, 49 U.S.C. §§ 20101 et seq. (FRSA). The second order granted Amtrak summary judgment, on the ground that there was no triable issue of fact, on plaintiff's remaining claim that the train's warning signals were inadequate. We affirm in part, and reverse and remand in part.
 
 I. Background
 
 3
 The record before us discloses the following facts, which are undisputed unless otherwise noted.
 
 
 4
 On January 19, 1997, at 3:26 p.m., the decedent was killed when the pick-up truck in which he was a passenger was struck by a passenger train at a railroad highway grade crossing in Putnam, NY. The driver of the truck was also killed. The two men were returning home from Putnam House, a bar and restaurant, where each consumed three beers and some food. The Amtrak train was traveling north at a speed of 48 miles per hour as it approached the railroad crossing. The truck was heading east as it approached the crossing, which has no gates on either side. There is, however, an X-shaped wooden warning sign posted on the west side of the crossing, visible to road traffic traveling east across the tracks. A large rock formation exists on either side of the track south of the crossing. These rock outcroppings bar visibility for a driver driving east over the crossing and looking south along the tracks. The driver can see an approaching northbound train only when the train reaches a point 500 feet from the crossing. The train in this case, at its rate of speed, would have been visible from the crossing for only seven seconds prior to the collision.[2]
 
 
 5
 The train sounded a warning whistle 11 seconds prior to the collision and four seconds prior to the collision. Amtrak argues that a whistle was also sounded 25 seconds before the crossing at the whistle post, which is located 1750 feet south of the crossing. Macfarlane argues that the train first sounded the whistle at 11 seconds.
 
 
 6
 At four seconds prior to the collision, the engineer saw the truck crossing the tracks from west to east and sounded the whistle, and at three seconds applied the emergency brakes. The train struck the truck on the passenger side, tossing it 50 feet before it hit a telephone pole. Both men were killed instantly.
 
 
 7
 In January 1999, Macfarlane brought this wrongful death action in the Superior Court of Addison County, Vermont against the alleged track owner, Canadian Pacific, for its alleged negligence in "maintaining and repairing its tracks and properly warning of on-coming trains" and against Amtrak for its alleged failure to operate the train "in a safe manner which included giving proper warning of its approach ... and traveling at a safe rate of speed in its approach to the intersection." Based upon diversity jurisdiction, defendants removed the case to the United States District Court for the District of Vermont.
 
 
 8
 Thereafter, both defendants moved for summary judgment. In September 2000, the district court granted summary judgment to Canadian Pacific on the ground that it neither owned nor controlled the track on which the collision occurred. In its opinion the district court also granted partial summary judgment to defendant Amtrak on Macfarlane's claim of excessive speed, on the ground that the claim was pre-empted by the FRSA. However, the court denied summary judgment to Amtrak on Macfarlane's claim of inadequate auditory warning, finding that there was "a genuine issue of material fact" regarding when the train's whistle was initially sounded, and whether it was "sufficiently in advance of the collision."
 
 
 9
 Two months later, Amtrak filed a renewed motion for summary judgment on the inadequate auditory warning claim. In December 2000, the district court changed its mind and granted summary judgment to Amtrak on the ground that there was no triable issue of fact as to the adequacy of the train's whistle warning. Macfarlane now appeals the district court's grant of summary judgment to Amtrak on both of Macfarlane's claims.[3]
 
 II. Discussion
 A. Standard of Review
 
 10
 The district court's grant of summary judgment is reviewed de novo, drawing all factual inferences in favor of the non-moving party. Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 343 (2d Cir.1999).
 
 
 11
 B. Federal pre-emption of claim for excessive speed on facts of this case
 
 
 12
 Macfarlane's first argument in this appeal is that the district court erred in holding that the claim concerning the train's speed at the time of the accident was pre-empted by the FRSA.
 
 1. District court proceedings
 
 13
 As indicated above, Macfarlane's complaint alleged that Amtrak failed to operate the train "in a safe manner which included ... traveling at a safe rate of speed in its approach to the intersection." FRSA regulations provide maximum train speeds for every track class. See 49 C.F.R. § 213.9(a) (2000). At the time of the accident, the Amtrak train was traveling at a constant speed of 48 miles per hour, which the parties agree was below the established federal speed limit. Amtrak, in its first motion for summary judgment, thus argued to the district court that Macfarlane's claim of excessive speed was pre-empted by the FRSA and its regulations.
 
 
 14
 Amtrak based its pre-emption argument primarily on the Supreme Court's holding in CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In that case, plaintiff Easterwood argued that despite defendant CSX's compliance with FRSA speed regulations, it breached its common law duty to operate its train at a moderate and safe rate of speed in light of the conditions at the particular crossing where the collision occurred. Id. at 673, 113 S.Ct. 1732. Defendant CSX countered that this claim was "pre-empted because the federal speed limits are regulations covering the subject matter of the common law of train speed." Id. The Supreme Court rejected Easterwood's argument, interpreting the FRSA broadly to preclude the suit against the railroad where the train in question was in compliance with federal speed regulations. Id. at 674-76, 113 S.Ct. 1732. The Court stated that the speed limits in the FRSA regulations were set with safety concerns in mind, id. at 674, 113 S.Ct. 1732, and that these regulations "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." Id. at 675, 113 S.Ct. 1732 (emphasis supplied). Easterwood's claim that the train was traveling too fast given the "time and place" was therefore pre-empted. Id. at 675, 676 n. 15, 113 S.Ct. 1732.
 
 
 15
 In its first summary judgment papers, Amtrak argued that Macfarlane's excessive speed claim was no different from Easterwood's claim in CSX that the train was traveling too fast given the "time and place," which the Supreme Court had held was pre-empted. Id. Amtrak claimed that "conditions posed by the grade crossings" necessarily include track geometry and sight distances at particular crossings, and that "[p]laintiffs have failed to demonstrate how the rock outcropping ... does not constitute part of the `track conditions.'"
 
 
 16
 In opposition to Amtrak's first motion for summary judgment, Macfarlane argued that the location of the rock outcropping and the resulting obstructed view were not related to the condition of the crossing, and therefore the Supreme Court's statements in CSX did not apply to Macfarlane's claim based upon excessive train speed in light of the obstructive rock out-croppings. Thus, Macfarlane contended, the claim was not pre-empted by the FRSA regulations.
 
 
 17
 Macfarlane also pointed to a saving clause in the FRSA, which was discussed by the Supreme Court in CSX. Id. at 675, 113 S.Ct. 1732. That clause provides that a state may continue in force an additional or more stringent standard regarding railroad safety when necessary to eliminate or reduce "an essentially local safety hazard" when not incompatible with any federal law.[4] Macfarlane asserted that, unlike the situation in CSX, the rock outcropping at the Putnam crossing does pose an "essentially local safety hazard" to which a state law addressing railroad safety, New York Railroad Law § 53-a, applies. According to Macfarlane, § 53-a requires railroads to maintain a clear line of sight to the crossing.[5] Relying on a footnote in the majority opinion in CSX, 507 U.S. at 675 n. 15, 113 S.Ct. 1732, Macfarlane also argued that CSX "did not address the question of preemption of related tort claims for breach of the duty to slow a train to avoid a specific hazard."[6] Therefore, Macfarlane argued, the tort claim against Amtrak for breach of the duty to slow the train down to avoid the essentially local hazard of the rock outcropping was not pre-empted.
 
 
 18
 In the district court, Amtrak replied that the FRSA saving clause saves only state laws that particularly address a hazard at the crossing in question, and does not save state laws that apply generally to common law negligence claims. Amtrak argued that plaintiffs can point to no pre-existing common law or state law requiring trains to slow at the Putnam crossing because of any specifically identified hazard existing there. Accordingly, Amtrak argued, Macfarlane's claim was pre-empted by federal law.
 
 
 19
 In an opinion filed on September 7, 2000, the district judge analyzed CSX, and held Macfarlane's claim pre-empted by the FRSA speed regulations. Referring to CSX, the judge stated:
 
 
 20
 Although, on their face, [the FRSA speed regulations] address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate, the overall structure of the Secretary's regulations demonstrates that these speed limits were adopted with safety concerns in mind and should be understood as `covering the subject matter' in question.
 
 
 21
 It is clear from [language in CSX] that the Court construed preemption in the area of speed broadly, and did not intend the "specific individualized hazard" language of footnote 15 to apply to the rock outcropping in this case. The language of footnote 15 could more reasonably be considered to trigger a duty to slow or stop under common law when, for example, the operator of a train observes a specific individualized hazard such as a car stalled on the tracks at a grade crossing. (Citations omitted).
 
 
 22
 The district court therefore granted summary judgment to Amtrak because Macfarlane's claim regarding the speed of the train in relation to the rock outcropping was pre-empted.
 
 2. Analysis
 
 23
 In this court, the parties raise essentially the same arguments on this issue as they did in the district court, with one exception discussed below.
 
 
 24
 Macfarlane actually makes two arguments to us. The first is that in light of the alleged obstructive effect of the rock outcroppings, Amtrak had a duty to slow the train down at the Putnam crossing, even though ordinarily any speed below the federal speed limit would have been reasonable. With regard to that argument, we agree with the district court that Macfarlane's claim on these facts that the train should have slowed down is pre-empted. Macfarlane argues that this claim is not pre-empted because the rock outcropping does not fall within the Court's definition in CSX of "track conditions, including the conditions posed by grade crossings." 507 U.S. at 675, 113 S.Ct. 1732. This argument is not insubstantial. It may be that the obstructed visibility caused by the rocks is the type of "specific, individual hazard" that the Supreme Court was careful to note it was not "address[ing]" in footnote 15 in CSX. See note 6 above. However, we believe that the district court correctly confined that phrase to such non-permanent situations "as a car stalled on the tracks at a grade crossing."
 
 
 25
 The second argument Macfarlane makes in this court (apparently not made below) is that New York Railroad Law § 53-a, which Macfarlane asserts is not pre-empted, imposes a duty on Amtrak to remove the rock outcropping, with which Amtrak has failed to comply. However, in the district court, Macfarlane neither clearly presented the argument nor offered proof of Amtrak's right or ability to remove the rock outcropping. Under the circumstances, we will not consider this argument.
 
 
 26
 We therefore affirm the district court's grant of summary judgment to Amtrak on Macfarlane's claim of excessive speed on the facts of this case.
 
 C. Auditory warning claim
 
 27
 Macfarlane's second claim is that Amtrak failed to give proper warning signals of the train's approach to the grade crossing. Macfarlane asserts that the district court erred in concluding there were no triable issues of fact on this claim.
 
 1. District court proceedings
 
 28
 As will be seen below, the question comes before us in an unusual procedural context. In its first motion for summary judgment on this issue in the district court, Amtrak stated that "[a]t a distance of approximately 774 feet from the crossing, the assistant engineer, who was in control of the locomotive at the time, began sounding the train's whistle." (Emphasis supplied). Amtrak asserted that this occurred some 11 seconds prior to the accident and impliedly took the position that this was adequate notice. Amtrak also included in its papers a copy of a New York State Police report by Trooper James Halvorsen containing the following relevant entries:
 
 
 29
 The recorder indicated the following information:
 
 
 30
 . . .
 
 
 31
 Time elapsed from initial whistle to emergency braking — 8 seconds
 
 
 32
 . . .
 
 
 33
 Member's investigation and analysis determined the following:
 
 
 34
 . . .
 
 
 35
 Time from initial whistle to impact — 11 seconds
 
 
 36
 Distance from initial whistle to impact — 772 [feet]
 
 
 37
 The recorder referred to by the Trooper was the train's event recorder, which shows train activity such as speed, sounding of the warning whistle and application of the brakes. A print-out from the recorder was attached to the Trooper's report and was submitted by Amtrak to the district court.
 
 
 38
 Macfarlane's opposition papers to Amtrak's first motion for summary judgment accepted as a fact that the train sounded its whistle 11 seconds or 772 feet before impact. However, Macfarlane asserted that according to Macfarlane's expert, William M. Howerton, this was "too close to the crossing" under New York Railroad Law § 53-b, which "requires the sounding of the whistle 80 rods (1320 feet) from the crossing."[7]
 
 
 39
 In its September 2000 opinion, the district court denied Amtrak summary judgment on the issue of auditory warning. The judge referred to the positions of the parties, and held that
 
 
 40
 As the issue of whether the signal was sounded sufficiently in advance of the collision is a genuine issue of material fact, summary judgment on this issue is inapposite and therefore denied.
 
 
 41
 Two months later, as already indicated, Amtrak renewed its motion for summary judgment. In its papers, it asserted that the train's whistle was actually first sounded approximately 25 seconds prior to the collision. Amtrak explained that it had originally thought the whistle post was 772 feet south of the crossing, because Trooper Halvorsen's report indicated an initial whistle at 772 feet, but a later investigation by a Canadian Pacific employee revealed that the whistle post was actually 1750 feet south of the crossing. Therefore, Amtrak asserted, the Trooper's reconstruction "is demonstrably erroneous" with respect to the placing of the "initial whistle." Amtrak also asserted that the depositions of the train's engineer Richard Selva (Selva) and assistant engineer Robby Rider (Rider), both taken in January 2000, established that Rider sounded the whistle at the whistle post. Amtrak argued that the undisputed location of the whistle post, taken together with the two depositions, therefore established that the initial whistle was sounded at 1750 feet, or 25 seconds prior to the collision. Amtrak asserted that the deposition testimony was not contradicted by the Trooper's report, because the report was based only on the train recorder print-out submitted to the court, which begins three seconds after the northbound train passed the whistle post.
 
 
 42
 In reply on this issue to Amtrak's second summary judgment motion, Macfarlane stated that Amtrak had changed its position — which it obviously had — and again relied on § 53-b of the New York Railroad Law. Macfarlane pointed to inconsistencies between the Trooper's report made over three years earlier and the engineers' depositions, taken in January 2000.[8] Macfarlane relied on the Trooper's report as evidence that the initial whistle was sounded first at 11 seconds, and then again at four seconds, for a total of two whistle soundings. Macfarlane argued that the Trooper's report contradicts Rider's deposition statement that he sounded the initial whistle at the whistle post, and is consistent with Selva's description in his sworn statement that two whistle soundings occurred.
 
 
 43
 Macfarlane also argued that the depositions contain statements that are inconsistent with the recorder print-out. In his deposition taken over three years after the accident, Rider stated that the whistle blowing procedure he follows, and the procedure he followed on the day of the accident, is to sound the whistle as the train passes the whistle post, and to continue sounding the whistle as the train approaches the crossing. Selva stated in his deposition, taken on the same day as Rider's, that the engineer is required to sound the whistle from the whistle post to (and through) the crossing. However, the recorder print-out, beginning at 23 seconds before the train reached the crossing, shows 12 seconds of silence, one whistle sounding at 11 seconds, another seven seconds of silence, and then a second whistle sounding at four seconds. According to Macfarlane, these intervals of silence are inconsistent with the engineers' deposition statements of repeated or continuous whistle sounding.
 
 
 44
 Macfarlane also stressed that Trooper Halvorsen noted in his report that "[t]he recorder indicated the following information," thus showing the Trooper's knowledge that there was an event recorder that could furnish crucial information in investigating this double fatality.
 
 
 45
 In its December 2000 opinion, the district court changed its earlier view and granted summary judgment to Amtrak on the auditory warning claim. The court stated that
 
 
 46
 Macfarlane asks the Court to speculate that Trooper Halvorsen examined all the data from the event recorder, covering the train's operation before and at the whistle post, but has not established that he did so. Macfarlane asks the Court to speculate that an interval of more than twelve seconds between whistle blasts is inconsistent with the engineers' testimony of repeated or continuous whistle sounding, but has proffered no evidence on the issue. Macfarlane asks the Court to speculate that Amtrak destroyed the data for the time at which it claims the warning whistle was first sounded, but has submitted no evidence to warrant an inference that Amtrak acted improperly.
 
 
 47
 The judge therefore granted Amtrak summary judgment, holding that Macfarlane had not set forth specific facts showing a genuine factual issue for trial.
 
 2. Analysis
 
 48
 In this court, the parties make principally the same arguments on this issue as they made below on Amtrak's second motion for summary judgment. The key question is whether the train first sounded its whistle 25 seconds before the collision, as Amtrak now contends, or 11 seconds before the collision, as Macfarlane claims. It is clear that Amtrak, a party to this litigation, stated the latter in its first motion papers. It seems to us that this is significant evidence on the crucial factual issue. It is true that Amtrak withdrew this admission two months later and offered an explanation of why it did so. But the weight to be given to such explanation and the credibility it deserves are questions for the ultimate trier of fact. This is particularly true here when the support for Amtrak's position that the whistle was first blown at the whistle post (1750 feet and 25 seconds before the crossing) comes from the engineers' depositions, which contain some inconsistencies that undermine their credibility. For example, as Macfarlane argued in the district court, although both Rider and Selva state that the whistle was sounded continuously from the whistle post to the crossing, the event recorder print-out seems to indicate otherwise. Moreover, even assuming that the engineers' recollections over three years after the accident are accurate, they primarily establish the sequence of events, not the precise time at which they occurred. The district court stated in its second opinion that "Macfarlane asks the court to speculate that an interval of more than twelve seconds between whistle blasts is inconsistent with the engineer's testimony of repeated or continuous whistle sounding, but has proffered no evidence on the issue." We believe that the event recorder printout is such evidence.
 
 
 49
 In addition, in Trooper Halvorsen's report made shortly after the accident, he identified the "initial whistle" at 11 seconds before the crossing. We do not know the extent of the Trooper's investigation, or what information he had or could have had at his disposal when he prepared his report. While Amtrak asserts that the Trooper used only the print-out it submitted to the district court in his investigation, Amtrak does not say that earlier portions of the print-out were unavailable at that time.
 
 
 50
 At oral argument to us, Amtrak aptly characterized the event recorder as the "railroad equivalent of a black box" of an airplane. It is therefore reasonable to characterize any print-out preceding the one submitted by Amtrak to the district court as significant — even crucial — evidence. Moreover, Macfarlane argues that the event recorder has always been in Amtrak's control. It appears that the print-out from the event recorder is now missing for the time period during which Amtrak claims the warning whistle was first sounded. Macfarlane argued in the district court that under these circumstances, it was entitled to draw the inference that the missing data is unfavorable to Amtrak. As already indicated, the district court rejected this argument because Macfarlane's claim that Amtrak destroyed the data was simply speculative and Macfarlane had "submitted no evidence to warrant an inference that Amtrak acted improperly." However, the district court should not have, in effect, construed the absence of the recorder evidence against Macfarlane, who had no control over the event recorder and who was the non-moving party on the summary judgment motion.
 
 
 51
 Amtrak argues to us that Macfarlane never requested the data print-out for the earlier time period in question, and therefore the district court correctly ruled that no inference should be drawn that Amtrak improperly destroyed that evidence. However, we do not believe that it is necessary for Macfarlane to show that Amtrak destroyed the evidence in order to allow an inference that the earlier printout would not have supported Amtrak's position. It should be enough to show that Amtrak had control of the event recorder at the relevant times, that the evidence was available, and that Amtrak failed or refused to produce this evidence. Nation-Wide Check Corp. v. Forest Hills Distrib., Inc., 692 F.2d 214, 217-18 (1st Cir.1982); 1 McCormick on Evidence §§ 74.1, 264 (5th ed.1999); 2 Wigmore on Evidence § 291, at 228 (Chadbourn rev.1979). Macfarlane argues to us that in the district court, it did request these records from Amtrak, and has accordingly moved to augment the record in this court with Macfarlane's first set of interrogatories and requests to produce in the district court.[9] We do not decide these issues here; we leave it to the proceedings before the district court.
 
 
 52
 In this court, Macfarlane also relies again on New York Railroad Law § 53-b. See note 7 above. As already indicated, 80 rods equals 1320 feet. Macfarlane argues that the failure of a railroad to ring the bell or blow the whistle, in accordance with § 53-b, may be evidence of negligence in an action against the railroad for personal injury at a crossing. See Delaware & Hudson Co. v. Nahas, 14 F.2d 56, 58 (3d Cir.1926) (failure to ring the bell or blow the whistle at the proper time, pursuant to the predecessor section to 53-b, may be evidence of negligence by the railroad in a personal injury action); Ludlam v. Guilford Transp. Indus., 145 A.D.2d 860, 535 N.Y.S.2d 847, 849 (1988). It is undisputed that the whistle post is located 1750 feet south of the crossing. Therefore, if Macfarlane's assertion that the whistle was not blown at the whistle post is found to be true, then the train's failure to comply with the § 53-b requirement of sounding the whistle 1320 feet before the crossing may be evidence of Amtrak's negligence.[10]
 
 
 53
 Finally, Macfarlane's expert (William Howerton) stated in the district court that an auditory warning by the train 20 seconds prior to the collision (at a point 1408 feet south of the crossing) would have been adequate to alert a driver approaching the crossing of an oncoming train. Therefore, if Macfarlane is correct that the initial whistle was sounded at 11 seconds, then Amtrak's warning would be deemed inadequate by Macfarlane's expert.
 
 
 54
 We find that the issue of when the whistle was initially sounded is a genuine issue of material fact for trial. Therefore, we reverse the district court's grant of summary judgment on Macfarlane's claim of inadequate auditory warning, and we remand to the district court for further proceedings.[11]
 
 III. Conclusion
 
 55
 For the reasons stated above, we affirm the district court's grant of summary judgment on Macfarlane's claim of excessive speed on the facts of this case, due to federal pre-emption. We reverse the district court's grant of summary judgment on Macfarlane's claim of inadequate auditory warning. We remand to the district court for proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 As will be seen below, Canadian Pacific is no longer in the case
 
 
 [2]
 The parties agree that since the train was traveling northbound at a speed of 48 miles per hour (70.4 feet per second) prior to the accident, any distance in feet measured from the crossing to a point south along the track can readily be converted into a number of seconds prior to the collision
 
 
 [3]
 Macfarlane does not appeal the district court's grant of summary judgment to Canadian Pacific
 
 
 [4]
 Macfarlane cites to the saving clause as 45 U.S.C. § 434. The saving clause is now found at 49 U.S.C. § 20106 and provides, in pertinent part, that
 A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order —
 (1) is necessary to eliminate or reduce an essentially local safety hazard;
 (2) is not incompatible with a law, regulation, or order of the United States Government; and
 (3) does not unreasonably burden interstate commerce.
 
 
 [5]
 Section 53-a provides, in pertinent part, that
 The commissioner of transportation may require the railroad company ... wherever practicable to maintain its property at or near [a railroad] grade crossing free of obstruction to vision.
 
 
 [6]
 Footnote 15 stated:
 Petitioner [railroad] is prepared to concede that the pre-emption of respondent's [Easterwood's] excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard.... As respondent's [Easterwood's] complaint alleges only that petitioner's train was traveling too quickly given the "time and place," ... this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.
 
 
 [7]
 N.Y. Railroad Law § 53-b (McKinney 1991). Section 53-b requires, in pertinent part, that
 A person acting as engineer, driving a locomotive on any railway in this state, who fails to ring the bell, or sound the whistle, upon such locomotive ... at least eighty rods from any place where such railway crosses a traveled road or street on the same level, ... or [fails] to continue the ringing of such bell or sounding such whistle at intervals, until such locomotive and the train ... attached shall have completely crossed such road or street is guilty of a misdemeanor.
 
 
 [8]
 In addition to the depositions of Rider and Selva taken in January 2000, there were also one-page sworn statements given by both Rider and Selva on the day of the accident, January 19, 1997. These statements were submitted to the district court along with the depositions
 
 
 [9]
 Amtrak offers no substantial objection to the motion. Since we are remanding on the issue of auditory warning in any event, we see no persuasive reason to rule on Macfarlane's motion to us. We note also that in Macfarlane's response to Amtrak's second summary judgment motion in the district court, Macfarlane stated that
 [i]f the court is persuaded that ... Amtrak should be allowed to prevail as to the negligence issue, it is respectfully submitted that plaintiffs be allowed leave to amend to allege a claim for spoilage of evidence by Amtrak.
 The district court did not directly address Macfarlane's request.
 
 
 [10]
 The district court did not find it necessary to discuss the effect of § 53-b in its opinion
 
 
 [11]
 Additionally, Amtrak argues that even if there were a genuine issue of fact, the failure to sound the whistle earlier would not have been a proximate cause of the collision. Macfarlane disputes this contention. We leave this issue to be decided in the first instance by the district court