Donald PELLETIER, as Personal Representative of the Estate of Ronald H. Pelletier, Plaintiff

v.

Martin A. MAGNUSSON, et al., Defendants

No. CIV. 00–212–B–K.

United States District Court, D. Maine.

April 16, 2002.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

Donald Pelletier (Pelletier), the personal representative for the estate of Ronald Pelletier (Ronald), filed a complaint in the Maine courts seeking damages pursuant to 42 U.S.C. § 1983. Pelletier claims that the defendants' failure to prevent Ronald from committing suicide on October 3, 1998, while he was an inmate at the Maine State Prison violated his constitutional rights. The matter was removed to this court. (Docket No. 1.) The defendants in the action breakdown into two distinct groups: "the medical defendants" and "the State defendants." Pelletier alleges that the defendants were deliberately indifferent to Ronald's safety in violation of the Eighth Amendment proscription of cruel and unusual punishment. Now before the court is the motion for summary judgment by the State defendants: Martin Magnusson, Jeffrey Merrill, Stephen Zubrod, Alan Bartlett, Jason Stewart, Paul Lipman, and Thomas Roach. For the reasons articulated below, I **GRANT** the motion as to defendants Magnusson, Merrill, Zubrod, and Roach and **DENY** the motion as to Lipman, Bartlett, and Stewart.

## DISCUSSION

At the times relevant to Pelletier's claims Magnusson was the Associate Commissioner of Corrections for the State of Maine. Merrill was the warden of the Maine State Prison. Zubrod, a psychologist, helped design and set-up the Mental Health Stabilization Unit (MHSU) and was the clinical director of the unit until he took a medical leave the month before Ronald's arrival. Lipman, a licensed clini-

Tyler N. Kolle, Esq., Berman & Simmons, P.A., Lewiston, Plaintiff.

Diane Sleek, Susan A. Sparaco, Esq., Assistant Attorney General, Augusta, ME, Christopher C. Taintor, Esq., Norman, Hanson & Detroy, Portland, ME, Susan A. Sparaco, Esq., Assistant Attorney General, Augusta, ME, for Defendants.

---

1. Pursuant to Federal Rules of Civil Procedure 73(b), the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

cal social worker, was acting as the clinical director of the MHSU and was a member of Ronald's treatment team. Bartlett and Stewart were correctional officers on the unit at the time of Ronald's suicide. Sergeant Roach was the first shift supervisor for the security staff on the MHSU who worked weekdays.

## A. Summary Judgment Standard and State of the Record

As movants, the defendants are entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Pursuant to Local Rule 56, I limit my consideration of record materials to the parties' statements of material facts that are supported by citation to the record. D. Me. Loc. R. 56 ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."). In evaluating whether a genuine issue is raised I view all facts in the light most favorable to Pelletier, drawing all reasonable inferences in his favor. *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000).

However, I do not give weight to every fact that Pelletier has attempted to place before the court in his response to the defendants' motion. As these defendants point out, Pelletier's opposing statement of material facts does not contain a separate section of additional facts set forth in independently numbered paragraphs. *See* D. Me. Loc. R. 56(c). Consequently, the defendants' reply to Pelletier's opposing pleadings understandably does not include an opposing statement of material fact as envisioned by subsection (d) of Local Rule 56. To the extent that Pelletier has propounded additional facts that do not qualify or dispute the defendants' statements of fact I have disregarded them for purposes of passing on these motions.[2]

Also in their reply the defendants assert that the deposition and report of Lorraine Spiller, relied on by Pelletier on several occasions, are inadmissible hearsay. Spiller, a physician's assistant, is an employee of the Maine Department of Corrections, working in the division of inspections, quality assurance, and professional practices. (Spiller Dep. at 3.) It is her responsibility to examine the medical portion of the jail standards developed by the State of Maine and inspect prison facilities to assure that these standards, and/or the institution's own policies and procedures, are not violated. (*Id.* at 13 –14.) Directed by her supervisor to look into Ronald's

---

2. There are a few occasions in which Pelletier has referred to earlier paragraph responses to dispute a later paragraph. Though it generates much inconvenience for this Court and is not a practice to be commended on the grounds that it saves a party space and repetition, I have done my best to consider properly supported factual assertions that are referenced in this manner. On a few occasions I have treated factual statements as additional as to the paragraph response for which they first are asserted and disregarded them because they are not set forth in a separate statement of material facts to which the de-

fendants could respond. One or two times I have considered these statements when referenced in subsequent paragraphs if they can be properly construed as qualifications to or disputes of the later factual assertion. (*See, e.g.*, Pl.'s Resp. State Defs.' ¶ 51, 56.) Because of the manner in which Pelletier has responded to these two separate motions for summary judgment by the State and medical defendants, compiling the following rendition of disputed and undisputed facts has been a time -intensive and laborious task; a situation the rules are aimed at preventing.

case, as well as six or seven other deaths that had occurred at the State Prison within a two-year period, she wrote a report that included investigative work into the medical treatment of Ronald Pelletier. (*Id.* at 13 –15, 17.) In this process she requested all the information that the prison had pertaining to Ronald and reviewed what was provided to her. (*Id.* at 16.) Spiller conducted her investigation well after the Pelletier suicide; the memorandum heading on the report to her supervisor is dated September 29, 2000.

The State defendants assert that the Spiller report is inadmissible hearsay under Federal Rule of Evidence 802. They contend that the only hearsay exception that even arguably applies is Federal Rule of Evidence 803(8)'s exception for public records and reports. As it applies to a civil action this subsection reads:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ... or (C) in civil action and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8).

The defendants contend that this report is not admissible under subsection (A) because it is not a record of the activities of the office or agency. They state that Spiller's report does not reflect matters observed pursuant to a duty imposed by law for which she had a duty to report. And, they also contend that it fails under sub-

section (C) because it does not purport to embody the factual findings of the Maine Department of Corrections from an investigation made pursuant to authority granted by law. In support of this final proposition the defendants cite *Smith v. Isuzu Motors, Ltd.*, 137 F.3d 859, 862 (5th Cir. 1998).[3]

■ After reviewing the defendants' rather superficial arguments for inadmissibility and the *Smith* case, I do not find that they have made a sufficient argument for why the report would not fall under subsection (C)'s exception. In *Smith* the Fifth Circuit concluded that three memoranda reflecting agency staff members' preliminary opinions about passenger vehicle stability standards did not satisfy the subsection (C) standard for admissibility because they embodied the "positions and opinions of individual staff members, which the agency ultimately declined to accept" and were only interim, preliminary, and inconclusive. 137 F.3d at 862–63. Such is not the nature of the Spiller report. It appears to be final and, contrary to the State defendants' conclusory assertion to the contrary, I consider it to be "by" the Maine Department of Corrections from an investigation made pursuant to authority granted by law. In addition to *Smith*'s discussion, I have considered the Rule 803(8) analysis undertaken in *United States v. Funchess*, 73 F.Supp.2d 676, 677–80 (S.D.Miss.1999) and *Lewis v. Velez*, 149 F.R.D. 474, 487–90 (S.D.N.Y.1993). I also heed the caution by the First Circuit in *Lubanski v. Coleco Industries, Inc.*, 929 F.2d 42, 44–46 (1st Cir.1991) that I should confer at least an initial presumption of Rule 803(8)(C) admissibility on the investigative reports including the portions con-

---

**3.** Pelletier has not had an opportunity to respond to the inadmissibility argument raised in the reply brief.

taining the investigator's conclusions. Therefore, for purposes of this motion for summary judgment I will not disregard the factual assertions tethered to the Spiller report as long as they comport with the other requirements of summary judgment pleading.

### B. Facts Not Disputed and In Dispute

·It is not disputed that Ronald Pelletier hung himself with his belt on Saturday, October 3, 1998, in his cell on the stabilization corridor of the Mental Health Stabilization Unit (MHSU) at the Maine State Prison (MSP).

#### 1. History of the Mental Health Stabilization Unit of the Maine State Prison and Training

##### a. Not disputed

The MHSU at the MSP opened on January 5, 1998, (just shy of nine months before Ronald's suicide). The objective behind the unit was to provide a safe and therapeutic environment for MSP's seriously ill prisoners. It was established based upon a recommendation by a task force charged by defendant Martin Magnusson, then an associate commissioner for the Department of Corrections. Magnusson sought a design for a comprehensive, pro-active model for mental health within the Department of Corrections. Defendant Stephen Zubrod, a psychologist and the director of Mental Health Services at MSP was a task force member and he authored and edited the report. Magnusson and co-defendant Jeffery Merrill, the MSP warden, received the report, as did various other corrections administrators. The task force recommended the formation of the MHSU at MSP. The MHSU

unit at the MSP was funded by the Maine legislature.

In his preliminary work Zubrod spent several months visiting correctional mental health programs and facilities throughout the country and consulting with experts in the field. With Magnusson's and Merrill's support a MHSU steering committee was formed with Zubrod at the helm. The committee addressed the physical location, renovations, staff selection and training, treatment procedures and protocols, and post-orders for different "step down units" on the MHSU—all based on safety and prisoner needs. Additional mental health and security staff were hired, renovations were undertaken, and policies and post-orders were developed.

##### b. Disputed or qualified

The State defendants assert that Magnusson and Merrill delegated the task of developing policies and procedures respecting prisoner safety and security for the MHSU environment to Zubrod. (State Defs.' SMF ¶ 10.) Pelletier qualifies this assertion.[4] Pelletier notes that Magnusson has administrative and supervisory responsibilities over the entire Department of Corrections. (Magnusson Aff. ¶¶ 2,6,7.) With regard to Merrill, Pelletier notes that Merrill concedes that he had administrative and supervisory responsibilities over the MHSU and affirmatively approved of Zubrod's plan for it. (Merrill Aff. ¶¶ 2,3.) Both Magnusson and Merrill have had professional education in prisoner suicide issues in corrections and claim extensive contacts with mental health professionals. (Magnusson Answer to Interrog. 7; Merrill Answer to Interrog.7.)

---

4. In response to the State Defendants' Statement of Material Fact ¶ 10, Pelletier argues that Magnusson has attempted to "duck[] responsibility altogether" by attributing to the previous commissioner the decision to confer upon Zubrod the MHSU implementing responsibilities, a decision that Magnusson left unchanged when he became commissioner.

Pelletier questions the placement of the MHSU in the former segregation unit of the MSP. While the defendants state that the steering committee considered many available sites before deciding on the segregation unit as the best due to several factors, (*see* State Defs.' SMF ¶ 14), Pelletier cites to expert testimony as support for his contention that the unit layout and the time in between cell-by-cell checks does not sufficiently guard against "emergencies." (Cohen Dep. at 37–49.)

Pelletier contests the defendants' factual assertions vis-à-vis training sessions for the new unit conducted by Maine's Department of Mental Health, Mental Retardation, and Substance Abuse, sessions that the defendants state covered suicide. (*See* State Defs.' SMF ¶ 16.) He also disputes the assertion that defendants Sergeant Thomas Roach and Zubrod oriented the MHSU staff on January 1, 1998, to "the physical structure, security post orders, the working alliance of the mental health personnel and security staff, procedures for handling emergency situations, and suicide detections, prevention and intervention." (State Defs.' SMF ¶ 17.) Pelletier cites to the deposition of one prison guard assigned to MHSU, defendant Jason Stewart, who indicated that he had no additional mental health training when his was posted to the unit to supplement the initial six-week training he received when he first qualified as a corrections officer. (Stewart Dep. at 5, 7–8, 72.) Stewart received only information on a day-to-day basis and had

not seen written policies prior to this litigation. (*Id.* at 6–7, 71–72.) Defendant Alan Bartlett had never seen the "MHSU Suicide Prevention ·and Intervention Policy" prior to this suit and his only training in suicide prevention had been when he first joined the Department of Corrections. (Bartlett Dep. at 9–12, 52–53.) Defendant Paul Lipman, who was clinical director for the MHSU during Ronald's detention, was hired to teach the initial training module on suicidal ideation for the Department of Corrections. (Lipman Dep. at 8, 11–12.) The only training on the MHSU Lipman speaks of providing was "informal," such as describing schizophrenia and its symptoms. (*Id.* at 11.) Lipman also was vague as to whether there were written policies available. (*Id.* at 28–29.) Pelletier does not contest that all corrections officers are required to complete a six-week basic training course.

### 2. Plan for Supervision, Staffing, and Care on the MHSU

#### a. Not disputed

By design the MHSU has four levels of supervision and care broken down into four distinct corridors.[5] The acute corridor is for inmates who are a danger to themselves or others, for instance threatening suicide or an assault, because of an acute exacerbation of a major mental illness. It has three beds in three individual cells. The prisoners are not allowed personal property and in 1998 they were al-

---

**5.** With regards to the description of the four corridors that follows, Pelletier admits that the cited Zubrod Affidavit supports the factual statements. However, he asserts that Zubrod is not competent to testify as to what the situation at the MHSU was when Ronald was an inmate. Pelletier argues that the defendants have not provided a foundation that Zubrod knew what was going on during that time -period because Lipman was the clinical director of MHSU during Ronald's residency.

However, Pelletier's response to parallel allegations in the medical defendants' Statement of Material Facts that are supported by citation to Lipman's deposition demonstrate that this is an objection that is more form than function and as I have bent over backwards for Pelletier with respect to his cross-referencing I will give the defendants the benefit of the doubt on this score, as the Lipman Deposition amply supports these factual statements regarding the MHSU set-up.

lowed no clothes, only a safety blanket and mattress. Inmates are monitored constantly by camera and fifteen-minute physical checks are conducted. If it is necessary due to an inmate's condition one-to-one constant monitoring is undertaken. Meals are delivered on paper plates by security staff. No activities outside of the cells are permitted. The expectation is that the "vast majority" of inmates at the acute level would, in a short time, respond to treatment sufficiently to shift into the next level of care.

The sub-acute corridor is for inmates suffering from acute symptoms of major mental illness but who are not a current danger to themselves or others. It has six beds in six individual cells. These inmates wear state-issued clothing and are allowed some personal items such as books and writing materials. Meals are taken in their cells. They are allowed an hour of exercise on the corridor each day, a time during which they can use the telephone and shower. Staff physically check the inmates every fifteen minutes.

The stabilization corridor is for inmates for which a treatment plan has been initiated and who need in-house supervision. This corridor has eleven single-person cells that face a large open corridor and a bank of windows. There is a dayroom area equipped with a television, exercise bike, and a foosball table. The inmates have access to a telephone, games, and a small library. They have their own clothing, including belts. They can be out of their cells for six hours a day, one of these hours can be spent in a small exercise area and they can spend three of these hours outside the cell at night every other night. They eat their meals outside their cells at the tables with normal utensils. These inmates are provided individual and group counseling, educational tutoring and Bible study. They can also have an opportunity for small job assignments. Checks on the stabilization unit inmates are performed every thirty minutes.

The fourth corridor, the respite unit, functions as a halfway house to prepare inmates for discharge back into the general prison population. In 1998 it had eleven beds in eleven single cells. The inmates are under clinical supervision by their treatment team but otherwise function as general-population prisoners, able to leave the unit for such things as meals, recreation, education, crafts, and jobs.

The MHSU was designed to utilize an interdisciplinary team approach to care, with at minimum one staff member from each of the security, medical, and mental health staffs on each inmate's team. Each unit has at least two correctional officers on duty at all time as well as day and evening shift supervisors during the week. Per the design, in 1998 there was a mental health on-call system that had three psychiatric social workers that rotated weekly on-call duties. The unit was designed to ensure access to an on-call psychiatrist or physician twenty-four hours a day, every day. Each inmate was to be assigned to a primary therapist to ensure continuity of care.

### b. *Disputed or qualified*

The defendants state that MHSU has a policy of allowing any staff member, including security staff, to initiate placement of a prisoner on suicide watch as long as a mental health staff member is contacted "as soon as possible." (State Defs.' SMF ¶ 25.) Pelletier qualifies this statement. He points to deposition testimony by State defendant Lipman and medical defendant Michael Tofani, a psychiatrist, that makes no reference to the need to contact a mental health worker as soon as possible. (Lipman Dep. at 22; Tofani Dep. at 77.) He also cites to Blake's testimony that it is

usually a team decision as to whether an inmate is placed on the acute corridor. (Blake Dep. at 26.) I take this qualification with a grain of salt as the testimony that Pelletier references concerns transfers from one corridor to another and does not speak of decisions to place an individual on a "suicide watch." Although the term "suicide watch" is never defined, Pelletier admits there is record support for the defendants' assertion in ¶ 26 that specific procedures for suicide prevention and intervention were developed and instituted in 1998.

The defendants state that the MHSU has access to nursing staff twenty-four hours a day, seven days a week via the prison infirmary. (State Defs.' SMF ¶ 28.) Citing Blake's deposition testimony, they state that a nurse visited the units on a daily basis to administer medications (Blake Dep. at 24) and the nurses can speak with the inmates when they are administering medication or when they are called in to assess an inmate (Bartlett Dep. at 16–17). Pelletier qualifies these assertions. He bickers with the record citations, though he does note that there is record support for the allegation that nurses were always available and visited the units daily. (Lipman Dep. at 17; Blake Dep. at 25.) He also notes that Lipman testified that nursing personnel had to consult with him before obtaining authorization from the on-call psychiatrist to change medication. (Lipman Dep. at 17.)

With respect to the rotating on-call psychiatric social workers, the defendants state that a social worker from the outpatient mental health department, Diane White, visited the MHSU inmates on one weekend day a week. (Blake Dep. at 19; Lipman Dep. at 16; Stewart Dep. at 25.) Pelletier states that Lipman testified that the on-call system was relatively new during the period at issue here and that this newness might have impacted the exercise of the prison staff's judgment as to whether or not to call in mental health staff. (Lipman Dep. at 14–16.) There were no mental health workers assigned to MHSU other than Blake and Lipman. (Blake Dep. at 12; Lipman Dep. at 9.) Pelletier also asserts that there were no mental health workers on the MHSU in the late afternoon, evenings, and throughout the night. (Lipman Dep. at 32–33.) Pelletier cites to testimony in the record that indicates that White came in "some Saturdays" (Stewart Dep. at 25; see also Lipman Dep. at 16), "usually" on Saturdays (Lipman Dep. at 32–33), but that she was not in on a Saturday preceding October 3, 1998, when Lipman was called-in because of Ronald's mental state (Lipman Dep. 16.) With respect to this final assertion, it appears that the Lipman testimony cited is really that White was not there on October 3, 1998.

Regarding the defendants' assertion that Doctor Tofani, a medical defendant and psychiatrist, saw MHSU inmates on a scheduled basis for five-and-a-half to six hours a week, (State Defs.' SMF ¶ 30), Pelletier qualifies. He cites Lipman's testimony that Tofani's MHSU time was very limited and he spent "several hours," maybe from 8:00 a.m. until noon on site. (Lipman Dep. at 30.) He notes that Tofani had input into the list of inmate contacts that he had for the visits and would limit the time in between visits when he prescribed a new medication for an inmate. (Tofani Dep. at 19.)

### 3. *Treatment Team*

### a. *Not disputed*

The treatment team apparently consisted of the clinical director of the MHSU (first Zubrod, then Lipman), defendant Cecelia Blake, someone from medical, and two representatives of the security staff,

including State defendant Roach. Before Ronald arrived Zubrod took a medical leave of absence. Lipman, who is a licensed clinical social worker, took over as clinical director of the MHSU.[6] Blake, the CMS employee, is a licensed social worker and practical nurse. When hired in August of 1998 to work on the MHSU clinical staff she had experience in the prison's mental health department and in the nursing department. Lipman and Blake worked as a *clinical* team on the MHSU.[7] Lipman and Blake worked full-time on the MHSU, Monday through Friday, with their shifts starting at 7:30 or 8:00 in the morning and ending at 4:30 or 5:00 in the afternoon. Lipman also had on-call responsibilities.

State defendant Sergeant Roach was the first shift supervisor for the MHSU security staff. He worked 6:18 in the morning to 2:48 in the afternoon. He was one of two representative members of the security staff on the MHSU treatment team, and in this capacity he advised the clinical team member of inmate security issues and the security staff's observations about inmate behavior. The security staff and mental health staff communicated with each other verbally and through written logs.

### b. Disputed or qualified

The defendants cite Lipman's and Blake's deposition testimony that most of the workday for Lipman and Blake was spent interacting with the MHSU inmates and that they would "touch base" with all of the inmates every day. (State Defs.'

SMF ¶ 39.) There was a report sheet that helped them share information on a daily basis with security staff. (*Id.* ¶ 41.) The security staff also maintained a daily log for recording events such as checks of units, persons entering and exiting the unit, and unusual occurrences. (*Id.*)

Pelletier states that though the deposition testimony supports these assertions of fact, the written logs do not support this contention and the "records pertaining to both the MHSU and Ronald are incomplete, incoherent[,] and have been tampered with." This is not the only point in his response to the defendants' motion that Pelletier makes this assertion. The implication of this spoliation of the evidence argument is significant; I discuss it in some depth below.

### 4. Ronald Pelletier

### a. Prior to September 18, 1998

### i. Not disputed

Ronald arrived on the MHSU on July 30, 1998. He was serving the five-year unsuspended portion of a twelve-year sentence for arson. Ronald was a paranoid schizophrenic who had a history of auditory hallucinations and he continued to suffer from hallucinations throughout his incarceration on the MHSU.

Medical defendant, Doctor Tofani saw Ronald on August 2, 8, 18, 25 and September 1, 8, and 15. Tofani did not believe that Ronald could be cured of his auditory hallucinations. Tofani planned to "move things towards normal" for Ronald as

---

6. Pelletier admits this factual statement. He also adds many factual assertions about Lipman's training and work history. However, these are neither disputation nor qualification of the factual assertion by the defendants and since Pelletier has declined to present these to the court and to the defendants as an additional statement of material fact pursuant to Local Rule 56, I do not consider them as part of the record before me. This occurs in several subsequent paragraphs but from here on out I will not make note of this treatment.

7. Pelletier attempts to dispute this statement of fact by citing to Lipman's deposition testimony describing the *treatment* team as including security and medical staff members.

much as possible. He set a short-term goal of helping Ronald cope with the voices safely. He wanted Ronald to be able to reside safely off of the acute corridor, a corridor that Tofani thought did not help Ronald given his preoccupation with frightening thoughts.

The treatment team generally determined Ronald's housing assignment on the MHSU. However, Tofani and other prison staff, including the security staff, had authority to move prisoners to a more restrictive setting in an emergency or when the treatment team was unavailable.[8]

Blake describes Ronald's behavior as changing from day to day and Lipman observed that Ronald had the ability to cycle out of crisis quickly. Tofani last saw Ronald on September 15, 1998, and Ronald was as sick has he had seen him, "struggling miserably from day to day." Tofani took three steps on September 15 to help alleviate Ronald's symptoms. He adjusted the dosage and schedule of his Haldol. He adjusted the dosage and schedule of another medication, Lorazepan. And, he prescribed Cogentin on the theory that Ronald's agitation might be caused or exacerbated by muscle restlessness. On the next day Blake recorded that Ronald had had a better, quieter day, with no agitation or complaints of hearing voices.

Ronald had been moved among the acute, sub-acute, and stabilization corridors eighteen times between July 30, 1998, and September 18, 1998. On September 18, Ronald was moved for the last time from the sub-acute corridor to the stabilization corridor.

### ii. Disputed or qualified

The defendants assert that the treatment team, consistent with Tofani's recommendations, tried to help Ronald cope with the symptoms of his mental illness and his auditory hallucinations by engaging him in structured activities and other kinds of social interaction as much as possible while guarding his safety. (State Defs.' SMF ¶ 53.)

Pelletier responds that the clinic meeting notes do not demonstrate a focus on implementation of any normalization plan but focus instead on the time and medication Ronald required. He quotes clinic-meeting notes from September 8, 1998, indicating that Ronald "remains unstable. We are trying to maintain him on minimum doses of medications. He is unhappy with any medication changes and is very paranoid." (Pl.'s Resp. State Defs.' SMF Tab 5 at 29.) He also quotes the meeting notes from September 15 that read: "Mr. Pelletier is becoming very time consuming and remains on acute side. He is very ill and suicidal and is a continuing crisis. He complains of not sleeping well and hearing voices. It was noted that he is already heavily medicated." (Id. at 30.)[9] Pelletier contests the notion that the staff were working towards normalcy, pointing to the fact that every weekend there were no mental health workers on the MHSU. Citing Spiller's report, he states that there was a clear pattern of putting Ronald in a

---

**8.** Pelletier admits this statement of fact only as it relates to pre -September 15, 1998, events. He argues that Tofani had no more input into Pelletier's housing status after this date. However, the defendants have supported this statement by a record citation to paragraph 10 of Sergeant Roach's affidavit and Pelletier has not contravened this support in any way.

**9.** Pelletier complains that Tofani's recommendations are never referenced by a staff member in a progress note. His citation to the Spiller deposition does not support such a far sweeping assertion.

lower level of supervision and increased stimulation on Fridays, a step that would lead to his decompensation on Friday night or over the weekend when no clinical staff were around. He asserts that the security staff was not well schooled in either recognizing Ronald's decompensation or seeking help when faced with his "behavioral problems." (Spiller Dep. Ex. 1 at 184, 187–88.) This pattern continued even though Tofani recognized that Pelletier was having increasing difficulties on the weekends. (Tofani Dep. at 72.) Citing to the Spiller report, Pelletier also contends that the contradictions between logs makes any information suspect. (Spiller Dep. Ex. 1 at 188.)

The defendants assert that when Ronald was acutely psychotic or expressing suicidal ideation, or when he was feeling unsafe, the team would have Ronald moved to the acute corridor. (State Defs.' SMF ¶ 55.) When he was feeling better and his behavior was appropriate the team would have him moved to a less-restrictive and healthier environment. (*Id.*) Lipman thought that the stabilization corridor was the most normal and therapeutic environment for Ronald and that the likelihood of harm to Ronald's mental status when Ronald was on the acute or sub-acute corridors outweighed the risk of suicide unless Ronald was in a state of psychosis or suicidal ideation. (*Id.* ¶ 56.) Thus, Lipman supported Ronald's placement on the acute or sub-acute corridors only so long as Ronald's behavior indicated acute psychosis or suicidal ideation. (*Id.*) Staff observed that Ronald did well on the less restrictive sta-

bilization corridor and that he benefited from the increased opportunities to interact with staff and inmates. (*Id.*)

Pelletier counters that there was a clear pattern of moving Ronald to a lower level of supervision every Friday, regardless of the state of his psychosis and that he would be left there until the following Monday without access to clinical help. His citation to Spiller's report qualifies the defendants' factual assertion. (Spiller Dep. Ex. 1 at 188, 192, 196.) [10] The stabilization corridor was very noisy and chaotic and Ronald was not able to tolerate the stimulation. (Tofani Dep. at 45.) By September 1 Tofani recognized that moving Ronald to the stabilization corridor, though part of the plan, may have been overwhelming to him. (*Id.* at 47.) He continued to deteriorate and by September 8 Ronald was becoming self-destructive in Tofani's view. (*Id.* at 50, 54.) By September 15 Ronald had degenerated further, was on a downward curve, and was as sick as Tofani had seen him. (*Id.* at 50, 54, 59.)

The defendants acknowledge that Tofani questioned whether the prescribed medications could successfully control Ronald's symptoms. (State Defs.' SMF ¶ 58.) Pelletier qualifies this by citing Tofani's deposition and notes that he considered prescribing Clozaril at this juncture, (Tofani Dep. at 58; Spiller Dep. Ex. 1 at 194), and suggests that Tofani resisted taking this step because of the resistance on the part of CMS due to Clozaril's expense. (Tofani Dep. at 51–53).[11]

The defendants assert that the "treatment team" kept Ronald on the acute cor-

---

**10.** Pelletier also challenges the defendants' assertions on this score by stating that Ronald attempted suicide on September 14. According to the cited page of Spiller's report this was a Monday. (*Id.* at 193.)

**11.** In support of the assertion that cost was a consideration, Pelletier refers back to a prior

response in support of the proposition that the clinic meeting notes "commented on the amount of medication Pelletier received 'already.'" However the cited minutes state with respect to medication only: "It is noted he is already heavily medicated." (Pl.'s Resp. State Defs.' SMF ¶ 53.)

ridor for another day after the September 15 change in medications and then the treatment team moved him from the acute to the sub-acute corridor. (State Defs.' SMF ¶ 60.) Pelletier qualifies this representation noting that Tofani had no role in moving Pelletier. (Tofani Dep. at 67.)

### b. September 18 through October 3, 1998

### i. Not disputed

Ronald was transferred from the sub-acute corridor to the stabilization corridor on September 18. On that date Blake noted that Ronald went out for exercise in the afternoon with Lipman. On Saturday, September 19, 1998, Joe Laggan, LPN, noted at 8:50 a.m. that he spoke with Ronald who was crying and stated that he did not want to take any more drugs and did not want to "be here anymore." Laggan noted that he talked with Ronald and that Ronald took his medication and "contracted for safety." A security log entry at 9:18 a.m. indicated that Ronald was yelling on the stabilization corridor and that on the authority of Sergeant Spearing and Captain Grotton he was moved temporarily to the sub-acute corridor. Later that day a notation was made that Ronald was moved back to the stabilization corridor about forty minutes later.

Diane White, a social worker, was on the MHSU on Sunday, September 20 and spoke with Ronald. She noted that Ronald reported that he had a painful call with his mother the previous day but that he

was okay. On Monday, September 21, Blake reported that Ronald was having a good day, while noting that he had become slightly agitated over the weekend. Blake also noted that Officer Waite reported that Ronald had a minor incident, described above, on Saturday and was brought to the sub-acute unit, "complied with the contract," and was returned to stabilization. On Tuesday, September 22, Blake described Ronald as having a quiet day. He had called his father regarding processing social security. On Wednesday, September 23, Blake noted that Ronald was having a good day, describing his condition as stable. On Thursday, September 24, Blake's progress note indicate that Ronald was "doing well" and that he had gone out into the yard twice.

On Friday, September 25, Lipman recorded that Ronald was still hearing voices at times but that they were not as aggressive as before, although they sometimes interfered with him getting to sleep right away and other times left him feeling confused.[12] Although Ronald was continuing to hear voices, Lipman did not believe that he was "floridly psychotic" or unable to function and interact with people in a normal way.[13]

On Sunday, September 27, White observed that Ronald seemed well and that he said he was well. He was observed watching television. On Monday, September 28, Blake's daily log note and Lipman's progress note refer to Ronald's attendance at a process group meeting. Lipman took

---

**12.** With respect to this sequence of factual assertions based on White's, Blake's, and Lipman's notes for this week Pelletier admits all but adds a "caveat" that the contradictions in the various logs as noted by Spiller (Spiller Dep. Ex. 1. at 188), "renders any information in them suspect."

**13.** In his response to this assertion in ¶ 71, Pelletier references his previous response to

¶ 70 (that laid-out additional facts after admitting the defendants ¶ 70). The text deals primarily with Lipman's failure to consult with Tofani and Tofani's expectations of how Ronald would be acting post September 15 given his history. The idea seems to be that Lipman's belief that Ronald was not "floridly psychotic" and able to function and interact should not be credited.

this participation as an indication of Ronald's improved health. On Monday September 28, Blake noted that Ronald was experiencing increased anxiety and agitation and that he was worried about his family.[14] She understood that the nature of his illness meant that he would continue to experience anxiety and auditory hallucinations from time to time but thought that Ronald was doing better as he was interacting with inmates, adjusting to the routine of the unit, and taking his medications. On Tuesday, September 29, Blake noted on her daily report sheet that Ronald was having a good day and he had played cards with another inmate. On Wednesday, September 30, Blake again noted that Ronald was having a good day and reported that he went out for his daily walk. The next day, Thursday, October 1, Blake's daily report indicates that Ronald had a good day and was stable. On Friday, October 2, Blake was away at a conference and Lipman saw Ronald. Ronald was reported to be doing real well.[15]

#### c. October 3, 1998

#### i. Not disputed

On the day that Ronald committed suicide, state defendants Lipman and Roach were not at work. Defendants Stewart and Bartlett were.

Officer Stewart had been a guard at MSP since 1996 and had been working on the MHSU since January 1998. He reported to work at MSP between 2:00 and 2:15 p.m. Officer Bartlett had also worked at the MSP since 1996. He had experi-

ence working on the MHSU and with Stewart, having been assigned to the MHSU in the period between January and August of 1998. Bartlett reported to work at 7:30 a.m., being scheduled to work the first shift on the prison's yard pool. After he completed that shift he was asked to work the second shift on the MHSU.

The normal routine for officers who are reporting for work at the MHSU was to get a briefing from the officers on the prior shift and from the mental health staff, if any were on the unit. Stewart normally would also review the daily logbook that security maintained, the daily report sheets, and the daily activity log.

Stewart was familiar with Ronald's behavior. He knew that Ronald would report hearing voices at times and Stewart had spoken with Ronald about the voices on a couple of occasions. Stewart observed that when Ronald was hearing the voices he would pace a lot. At least once before October 3 Stewart had assisted another officer in moving Ronald from the sub-acute unit to the acute unit after the officer found Ronald poking his wrist with a plastic fork. Stewart knew that if Ronald gave any indication of being suicidal Ronald was to be put on a constant watch.

Bartlett also knew that Ronald heard voices and remembered that Ronald had been on the sub-acute unit when Bartlett had previously worked on the MHSU. He recalled that a radio had been placed outside Ronald's cell to help him with the voices.

14. Pelletier states that the clinic meeting notes on September 29 indicate that on September 28 Ronald was "very anxious and hearing voices." The record cite for this qualification is merely "BS 31."

15. With respect to the defendants' allegation in this paragraph, covering Sunday, September 27 through Friday, October 2, Pelletier

"does not admit" the statements but refers only to his responses to ¶¶ 64, 65, 70 (and once back to ¶ 40). Without better articulation, the court can only assume that this is a reiteration of his contention concerning the discrepancies between and holes in the various records.

Ronald's mother spoke to her son on October 3, and Ronald asked her to send him a winter coat. She asked if he was okay and Ronald replied that he was "all right."

On October 3, the usual routine at the prison was changed. There was an Alcoholics Anonymous banquet scheduled at the prison and the inmates were fed and locked-down an hour earlier than usual. At around 3:00 p.m. Ronald and other inmates on the stabilization unit were locked in their cells to allow delivery of the meal trays for the evening meal.

Stewart recalls that after the 3:00 p.m. lock-down Ronald became angry, yelling at Stewart and asking for an explanation of why he was being locked in early. Although the extent of Ronald's anger was unusual in Stewart's view, Stewart recalls that Ronald calmed down and seemed to accept the explanation for the early lockdown. After the officers got the meals set-up on the unit, Ronald and the other inmates on the stabilization corridor were released from their cells to eat. There is no evidence that Ronald displayed any anger, caused any disruptions, or posed any other problems or concerns at this juncture. After the meal Ronald and the other stabilization unit inmates were locked in their cell for the night, this occurring for Ronald at about 4:00 p.m. One of the officers locked Ronald in by standing in front of his cell and turning the key. There is no evidence that Ronald behaved in a manner that caused concern to this officer.

The stabilization corridor where Ronald was this day was adjacent to the officers'

desk on the central corridor, separated from the central corridor where the officers' area is by a door. Between 4:00 p.m. and 4:30 p.m. Bartlett and Stewart heard bars rattling from the stabilization corridor. Bartlett entered the corridor to investigate the sound while Stewart remained at the officers' desk.

The defendants state that when Bartlett went into the stabilization corridor Bartlett recalls speaking with Ronald. He does not remember what Ronald told him but believes that he said he was hearing voices. In observing Ronald he did not believe that Ronald was an imminent risk of suicide or needed to be seen by the mental health staff. In the experience of Bartlett and Stewart bar rattling by inmates or reports that they are hearing voices are not unusual events, especially on the MHSU. If Bartlett thought that Pelletier was self-destructive at this juncture he would have remained with Ronald and asked Stewart to call the supervisor. He understood that if Ronald was in the process of hurting himself he could have moved him to the acute corridor on his own authority. He also knew that a mental health worker could be called if this kind of intervention was needed.[16] After he spoke with Ronald, Pelletier returned to the officers' desk.

A few minutes later the officers heard the bars rattling again. Stewart went to investigate. He walked past all of the cells in the stabilization corridor and observed nothing unusual. He did not determine who was rattling the bars. He exited the stabilization corridor, closing and locking the main door behind him.[17]

**16.** Pelletier disputes this statement stating that in light of the "obviousness of [Ronald's] behavior in light of his history, Bartlett's 'belief' is not credible." Nowhere in this paragraph, ¶ 101, do the defendants assert a "belief" by Bartlett. Pelletier's "see also" citations to his ¶ 89 and ¶ 93 response

do not help define a dispute with this paragraph.

**17.** Again Pelletier disputes this paragraph providing only, "*See* response to ¶ 93 above." The factual allegations in the ¶ 93 response do

The daily log indicates that at 4:30 p.m. a routine check of the unit was performed. These checks consist of an officer walking down each corridor and looking into each cell. The log entry for this check states that the unit "appeared okay."[18] At 4:40 p.m. Stewart and Bartlett heard bars rattling again. Stewart entered the stabilization corridor to investigate. He stopped at Ronald's cell and asked him if everything was okay. Stewart recalls that Ronald was sitting on his bunk, looking out. Ronald said that he was fine.[19] Stewart finished walking the corridor asking the other inmates if they were okay and then left the corridor. He never determined who was rattling the bars.[20]

Stewart again closed and locked the door leading into the stabilization corridor and returned to the officers' desk. Shortly, the bugle was blown to start the inmate count. Stewart started the count on the MHSU by going to the first cell on the stabilization corridor. He then went to the second cell, which was Ronald's. He saw Ronald hanging from his belt. Stewart hit his body alarm and yelled for help. He then attempted to lift Ronald up to ease the pressure on his neck.

Bartlett responded to Stewart's call for help. He saw Stewart trying to lift Ronald from outside the door. Bartlett told Stewart to retrieve the knife and then tried to lift Ronald so that he could unhook the belt from the bars. Stewart returned quickly with the knife and cut the belt. Bartlett lowered Ronald to the floor, and other officers, who had arrived on the scene, began CPR on Ronald. According to Stewart's incident report, prepared on October 3, Stewart found Ronald hanging at 4:53 p.m. As of October 3, Ronald was the only inmate who had ever committed suicide on the MHSU.

### ii. Disputed or qualified

The defendants assert that there is no evidence that on October 3 Bartlett or Stewart received any information from the prior shift that Ronald was having any problems. Pelletier claims that there was evidence to this effect but it has "simply" disappeared.

Pelletier states that Stewart reported to a detective conducting the State Police investigation that Ronald "lightened up some" and that he continued to yell and rattle his bars. He also reported to the detective that this was "the angriest" Stewart had seen Ronald. Stewart was aware of the weekend decompensation problem and recalled that the voices seemed worse for Ronald when there were not other people around or Ronald had nothing with which to occupy himself. With respect to the assertion that Stewart did not believe that Ronald was at an imminent risk of suicide or in need of the mental health staff, Pelletier states that Stewart knew that Pelletier's "normal" behavior was "very quiet." (Stewart Dep. at 14.) He also reasserts his contention that the missing records would dispute or qualify the defendant's rendition of events.

---

not conflict with or qualify the defendants' description of this sequence.

18. Once again, though Pelletier attempts to dispute this factual assertion, his conclusory comment that the unit was always "ok" and the reference back to his response to ¶ 53 do not give this court grounds to conclude that defendants' ¶ 104 facts are in dispute.

19. Pelletier, in not admitting this paragraph, cites to his ¶ 93 response which does nothing to dispute these particular facts.

20. Here Pelletier refuses to admit the statement citing again to ¶ 93 but also to ¶ 94. Pelletier's ¶ 94 response refers to his ¶ 93 and ¶ 89 response (which states that the evidence has disappeared).

The defendants assert that in the two-week period prior to the suicide Ronald did not appear to Lipman or Roach to be a substantial risk of hurting himself. Pelletier qualifies this by referencing medical defendant Tofani's concerns that it was not possible for someone with Ronald's condition to contract for safety because of the constant seesawing between diametrically opposed ideas and emotions. (Tofani Dep. at 84–85.) Pelletier seems to be asserting that there was a general failure to keep Tofani in the treatment loop. (*See* Pl.'s Resp. State Defs.' Facts ¶ 70.) The defendants should have been aware of Ronald's decompensation on the weekend. (Spiller Dep. Ex. 1 at 188–89.) He asserts that the contradictions in the logs make this statement by the defendants unsupported. (*Id.* at 188; Pl.'s Resp. State Defs.' Facts ¶¶ 64, 65, 70, 74.)

The defendants assert that defendants Magnusson, Zubrod, and Merrill made no decisions relative to Ronald's care and security. Merrill approved of Zubrod's plan for setting-up the MHSU, relying on the expertise of Zubrod and other mental health professionals. At no point prior to Ronald's suicide was Merrill informed that the staffing, treatment protocols, or suicide prevention procedures were inadequate to protect the inmates housed on the unit.

Pelletier denies these statements. Putting aside those assertions made without traceable, record support, he states that Magnusson and Merrill allowed untrained officers to staff the MHSU reiterating his earlier response to the factual assertion that training was provided. (*See* Pl.'s Resp. State Defs.' Facts ¶ 16.) Magnusson and Merrill also allowed Doctor Zubrod to take a medical leave without determining whether he had implemented the needed procedures, instituted a coherent record-keeping system, or provided training in mental health issues and suicide refreshers for the guidance of his staff. (*Id.;* Cohen Dep. at 62, 66–68.) Furthermore, with respect to staffing, they allowed a person without any professional clinical degree to be the clinical director of MHSU, assisted by an LPN with no clinical education, and they allowed the mental health unit to go without mental health staff on evenings and weekends. (Cohen Dep. at 72.)

### Discussion

### A. Has the Plaintiff Demonstrated the Presence of a Genuine Issue of Material Fact as to the Asserted Constitutional Violation that Prevents the Entry of Summary Judgment in Favor of the State Defendants?

### 1. The Deliberate Indifference Standard

The fact that Ronald was able to commit suicide in the prison while under the care of the medical defendants does not make out a prima facie constitutional violation. The constitutional protection that Pelletier asserts was infringed is the Eighth Amendment's prohibition against cruel and unusual punishment. In cases such as this the inquiry is whether the defendants were deliberately indifferent to Ronald's medical needs (in this case his mental health and attendant physical safety).

Two cases by the United States Supreme Court frame the deliberate indifference inquiry: *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The *Estelle* Court identified in the Eighth Amendment protection the "government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103, 97 S.Ct. 285. It observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* Unnecessary suffer-

ing caused by denial of medical care is "inconsistent with contemporary standards of decency." *Id.* The Court stated:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§ ] 1983.

*Id.* at 104–05, 97 S.Ct. 285 (footnotes and citation omitted).

*Estelle* made clear that "inadvertent failure to provide adequate, medical care" does not rise to the level of a constitutional violation; "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 105–06, 97 S.Ct. 285. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. 285.

In *Farmer* the Court more clearly articulated the standard a plaintiff must meet to hold a prison official liable under the Eighth Amendment. It identified two prongs. First, the deprivation alleged must be "objectively 'sufficiently serious.'" 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Second, the defendant must have a culpable state of mind, which means in prison conditions cases, that the defendant was deliberately indifferent to the inmate's health or safety. *Id.*

The first prong of this analysis is readily satisfied by Pelletier; the deprivation suffered in Ronald's case is a "serious harm" by any measure. The Seventh Circuit recently articulated the obviousness of this conclusion in a prison suicide case. *See Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir.2001) ("It would be difficult to think of a more serious deprivation than to be deprived of life, and thus plaintiff's claim clearly satisfies the first element [of *Farmer* ]."). That panel also observed that in a case such as Ronald's there can be other injury prior to the death, such as the failure to provide treatment for mental illness can be a "serious harm" in and of itself. *Id.* at 734.

With respect to this second prong, the *Farmer* Court clarified that the requisite state of mind is reckless disregard of the risk, a terrain that is somewhere between negligence and acting with the purpose of harming the inmate. 511 U.S. at 836, 114 S.Ct. 1970. ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk."). It is a subjective standard: the defendant must have consciously disregarded a substantial risk of serious harm. *Id.* at 839–40, 114 S.Ct. 1970.

With respect to the defendants' awareness of the risk the Court stated: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while not a cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," "and a factfinder may conclude that a prison official knew of a substantial risk from

the very fact that the risk was obvious." *Id.* at 842, 114 S.Ct. 1970. Furthermore, Pelletier need not prove that the defendants were subjectively cognizant of the danger of the precise harm that befell him. *Id.* at 843–44, 114 S.Ct. 1970.

Under the reasoning of *Farmer* if Pelletier can present evidence that there was a substantial risk that Ronald was a danger to himself that was " 'longstanding, pervasive, well-documented, or *expressly noted by prison officials in the past* ' " and the circumstances suggest that the defendants were exposed to the information concerning the risk, there would be sufficient evidence for the trier of fact to find that the defendants had actual knowledge of the risk. *Id.* at 842–43, 114 S.Ct. 1970 (quoting Brief for the Respondents). If the defendants merely refused to verify underlying facts or refrained from confirming inferences of a risk though they had a strong suspicion of impending harm, liability would still attach. *Id.* at 843 n. 8, 114 S.Ct. 1970. Conversely, the defendants might be able to show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. What is more, the defendants escape liability if they demonstrate that they were aware of the risk but responded reasonably to the risk even though they did not ultimately avert the harm. *Id.*

In cases decided before *Farmer*, the First Circuit has articulated a deliberate indifference standard that is tailored to cases involving in-custody suicide. In *Manarite v. Springfield*, 957 F.2d 953 (1st Cir.1992) the Court articulated a suicide specific deliberate indifference three-pronged standard:

The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

*Id.* at 956. *Accord Bowen v. City of Manchester*, 966 F.2d 13, 17 (1st Cir.1992); *see also Elliott v. Cheshire County*, 940 F.2d 7, 10 (1st Cir.1991) (a deliberate indifference suicide case requires a showing of a "strong likelihood, rather than a mere possibility, that self infliction of harm will occur," citation and internal quotation marks omitted). The First Circuit has yet to wrestle in a published decision with *Farmer* in the context of an Eighth Amendment deliberate indifference claim involving a custodial suicide. *See Davis v. Rennie*, 264 F.3d 86, 101 (1st Cir.2001) (discussing *Farmer* and the deliberate indifference standard, finding it an "awkward fit" for an excessive force claim by a mental institute patient); *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71–72 (1st Cir.1999) (dicta in student suicide case concerning deliberate indifference standard in prison (and mental institute) cases, citing *Farmer* ); *Consolo v. George*, 58 F.3d 791, 793 & n. 1 (1st Cir.1995) (reviewing for plain error jury instructions on an arrestee's deliberate indifference to medical needs claim, rejecting argument that trial court should apply *Farmer* in context of the Fourteenth Amendment claim of a pretrial detainee).

The *Manarite* three-step analysis accords with the approach taken to in-custo-

dy suicide claims by the Seventh Circuit post-*Farmer*. To wit, the second *Farmer* prong requiring a showing that the subjective mental state of the official was one of deliberate indifference to the inmate's safety becomes a two prong analysis in which the court inquires whether there was, one, an awareness of the substantial risk, and, two, whether the defendants took reasonable steps to prevent the inmate from committing suicide. *Sanville*, 266 F.3d at 737–39. *Accord Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir.2000) ("In order to be liable under the Eighth Amendment, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act."). In *Brown v. Harris*, 240 F.3d 383 (4th Cir.2001) the Fourth Circuit reflected that it was fair to extrapolate a "reasonable response" inquiry from *Farmer* vis-à-vis prison suicide claims:

> While the [*Farmer*] Court left open the question of whether the "reasonable response" prong of *Farmer* is part of the state of mind requirement or whether it instead stems from the duty to "ensure reasonable safety," *id.*, this prong nonetheless protects officials who act reasonably in response to a known risk. To the extent that the "reasonable response" prong is part of the state of mind requirement, an official who responds reasonably to a known risk has not "disregard[ed] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, and has therefore not acted with deliberate indifference.

*Id.* at 389.

### 2. *Spoliation of Evidence*

■ Before addressing whether this record demonstrates a sufficient factual dispute over whether or not any of the defendants were deliberately indifferent under the standard articulated above, I must first address Pelletier's spoliation of the evidence argument for it is integral to what the record does and does not show. Pelletier states that there are nine categories of documents, not including medication records, that are generated by the MHSU staff and medical personnel that are missing and/or have been destroyed. (1) A treatment plan was supposed to be created and updated for each inmate with specific treatment plans and goals, medication review, and recommendations for the future. The staff reports that there was such a plan for Ronald but it has not been produced. (Blake Dep. at 21–22; Tofani Dep. at 40.) (2) Progress notes for inclusion in the medical record were kept on each prisoner but pages nine and ten documenting Ronald's last weeks were removed. (Lipman Ex. 5 & Pl.'s Resp. State Defs. SMF Tab 3.) (3) Progress notes were kept by the clinical workers on each MHSU inmate and kept at the unit. The last entry for Ronald was September 28, 1998 even though the September 29, 1998, clinical notes record that Ronald was "very anxious and hearing voices" on September 28, 1998. (Lipman Dep. Ex. 2.) (4) Blake prepared a daily log of her activities and a daily report on each inmate. In the daily report other corrections officers and mental health workers would make entries. Pelletier emphasizes that entries for October 2 and 3 are missing, though he recognizes that Blake was not at the MHSU on October 2 and was not scheduled to work on October 3. (5) Tofani dictated notes concerning Ronald. (Pl.'s Resp. State Defs.' SMF Tab 4.) (6) CMS, clinical members of the MHSU, and other supervisors of the MSP attended mental health clinic meetings (which it seems that Pelletier believes

were somehow documented more completely than through the notes received in discovery). (Pl.'s Resp. State Defs.' SMF Tab 5.) (7) Corrections officers kept a daily log that recorded the activities of the unit. (Blake Ex. 2 at 225–530.) (8) A "constant watch log" was kept that recorded the activity of each fifteen-minute check. However, the defendants have produced the watch log for only up to August 4, 1998. (Blake Ex. 2 at 217–24.) (9) An activity or shower log was maintained but it is missing the entries from October 1 through October 3. (Pl.'s Resp. State Defs.' SMF Tab 6.)

Pelletier asserts that all of Ronald's records were removed by security after his death and the treatment plan and certain notes were never returned. He cites to the deposition testimony of Lipman and Blake acknowledging that documents are missing (Blake Dep. at 21; Lipman Dep. at 54–55) and to the Department of Correction's subsequent report on Ronald's suicide that recognized that documents were missing (Spiller Dep. Ex. 1 at 154, 156). Pelletier argues that because probative records in this case were deliberately removed from files pertaining to Ronald and this evidence is still missing the court should draw a negative inference that the documents contained evidence beneficial to Pelletier and detrimental to the defendants.

The defendants retort that Pelletier has not established the necessary foundation for drawing a negative inference as a result of the missing records. They state that Pelletier has not produced evidence that the records were destroyed at a time when the defendants knew of Pelletier's intent to sue and were cognizant of the potential relevance of the records to the claim. Furthermore, they argue, even assuming that a negative inference should be drawn, the inference would not be that the

defendants decided to abandon Ronald because his care was too costly and time-consuming. The only reasonable inference that could be drawn, the defendants assert, is that any "missing" documentation that ought to have been completed was not.

I have reviewed the nine categories of records asserted by Pelletier to be incomplete or tampered with. The following four categories identified by Pelletier raise a concern:

1. The treatment plan for Ronald is missing though medical defendants Blake and Tofani have testified that one existed. (Blake Dep. at 21–22; Tofani Dep. at 41.)

2. At least one, maybe two pages, from the medical record progress notes that are kept on each prisoner are missing. These pages might contain information about Ronald from the period of September 14 through October 3. (Pl.'s Resp. to State Defs.' SMF Tab 3 at 16–17, 19.) I say maybe two because the page bate stamped "17" which ostensibly is page nine of the progress notes, is in an entirely different pre-printed format than the other pages in this sequence. It has the beginning of an entry for September 15 scratched out and then one entry for September 28, about an assessment per request, then a large space-filling "X." The numbers "9" and "pg 10" in the right hand top corner are scratched out. There is no "ID Number" space on this form as there are on all the other odd numbered pages in the sequence, and Ronald's number, 28050, nowhere appears on this sheet. The first entry on the next page, bate stamped 19, is on October 3, at 6:00 p.m., and concerns the suicide.

3. The progress notes kept on the MHSU on each MHSU inmate by clinical workers ends on September 28, 1998. (Lipman Dep. Ex. 2.) And while most gaps in this sequence are at most a couple of days (appearing to fall on the weekend), there are no entries for the five final days of Ronald's life.[21]

4. The stabilization unit also keeps a separate daily activity log on each inmate. (Pl.'s Resp. to State Def. SMF Tab 6.) The defendants have not produced the log sheet recording October 2 and 3.

The remaining categories are not on their face suspect. Three other categories of records identified by Pelletier—Tofani's dictated notes, mental health clinic meeting notes, and a daily log of activities on the MHSU—do not have any apparent gaps. Pelletier's complaint about two other categories of records seems to fall off the mark. Pelletier asserts that there are "missing pages" for October 2 and 3 from a daily report "blue book" kept by Blake. He concedes that Blake was not at work on Friday, October 2, and was not scheduled to work October 3. In an effort to support his contention that pages are "missing," Pelletier contends that this blue book also contains some entries by corrections officers and other mental health workers, identifying only two times when this happened in the period between August 19 and October 1. He also contends that the MHSU keeps a "constant watch log" recording the activity for each fifteen minute check. He complains that the defendants have produced pages covering only July 30, July 31, and August 4. (Blake Dep. Ex. 2 at 217–24.) However, this rec-

ord appears to represent a log of a specially ordered constant watch covering Ronald and another inmate only, and is not something kept on each inmate (or Ronald alone) on a regular basis.

The First Circuit has many times visited the principles concerning spoliation of evidence and the evidentiary inferences that can be drawn as a result. The permissive (as opposed to mandatory) negative inference "springs from the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." *Testa v. Wal–Mart Stores, Inc.,* 144 F.3d 173, 177 (1st Cir. 1998). There are at least three rationales for allowing the inference. There is the general evidentiary rationale, in that the document must have some relevance to the claim(s) if the party charged with the spoliation went to the trouble to destroy it. *Nation–Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 218 (1st Cir.1982). There are also policy-based prophylactic and punitive reasons for permitting the inference, in that allowing the inference by the fact-finder deters future pre-trial destruction of documents and penalizes the spoiler by placing it at risk of an erroneous judgment that it might avoid if it had preserved the document. *Id. See also Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998) (adding to the evidentiary, prophylactic and punitive rationales, a "remedial rationale" suggesting that the adverse inference should function for the purpose "of restoring the prejudiced party to the same position he would

---

21. I note that there are no entries for August 1 through August 6. However, though the bate stamp for this period goes in sequence from 74 to 75, page 74, chronicling July 30, through July 31, is on a different pre-printed form than the remaining sheets and perhaps a sheet got lost in the shuffle. The last page bearing a single entry for September 28 is the only page in this sequence that does not have Ronald's MDOC number on it.

have been in absent the wrongful destruction of evidence by the opposing party").

To avail himself of the inference Pelletier must demonstrate a "suitable foundation." *Testa*, 144 F.3d at 177. He must provide evidence sufficient for a trier of fact to conclude that the defendants knew, one, of the litigation or the potential of litigation, and, two, of the document's or documents' potential relevance to the litigable claim. *Id. Accord Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir.1996).

With respect to the defendants' notice of Pelletier's potential claim it is almost self-evident that a prison death might lead to criminal or civil charges, and, as happened here, at minimum a state police investigation. *See Blinzler*, 81 F.3d at 1159 (district court did not abuse its considerable discretion in concluding that the hotel/defendant was on notice of a potential claim when it destroyed a print-out of outgoing calls made during the period a hotel guest had a heart attack and requested that the hotel get emergency assistance, observing further that the defendant was unable to locate the security log for the day). *See also Testa*, 144 F.3d at 178 ("Whether the particular person who spoils evidence has notice of the relationship between that evidence and the underlying claim is relevant to the factfinder's inquiry, but it does not necessarily dictate the resolution of that inquiry. The critical part of the foundation that must be laid depends, rather, on institutional notice—the aggregate knowledge possessed by a party and its agents, servants, and employees.")

As proponent of the inference, Pelletier "need not offer direct evidence of a cover[-]up to set the stage for the adverse inference." *Blinzler*, 81 F.3d at 1159.

This is not a situation where the documents were destroyed as a matter of routine; clearly these are records that should have been preserved. Nor have the defendants in countering the spoliation argument at this juncture in the litigation proffered an innocuous explanation for the absent records. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995) (death of attorney shortly after he took possession of the documents); *Nation–Wide Check Corp., Inc.*, 692 F.2d at 219 (downplaying the "innocuous" avoidance-of-storage-costs reason for the destruction of the documents, but observing that the justification could be considered in giving weight to the spoliation conduct). In any event, the defendants' explanation, if they have one, for why the documents are missing is an issue of credibility that can be left for trial. *Kronisch*, 150 F.3d at 127.

I conclude that the argument and factual support advanced by Pelletier as to the spoliation of the documents are sufficient to get him over the summary judgment hurdle as to Bartlett, Stewart, and Lipman, allowing him the opportunity to make the necessary showing at trial for why he is entitled to the inference. In so doing, I assume for purposes of this motion that the documents missing are those that the defendants were obliged to keep and that the destruction was intentional. *See Kronisch*, 150 F.3d at 126–27. This is a case that may well be at the "margin" as was the plaintiff's claim in *Kronisch*, which was also in a summary judgment posture. *Id.* at 128. As in that case, Pelletier has produced some evidence supporting his claim (that some of the defendants, at least, were deliberately indifferent to Ronald's health and safety),[22] and the inten-

---

**22.** Specifically, if believed, Pelletier has produced evidence that Lipman either knew or

recklessly disregarded the knowledge that Ronald cycled each weekend into psychotic

tional destruction of relevant evidence by the defendants has pushed "a claim that might not otherwise survive summary judgment over the line." *Id.* (reversing summary judgment in favor of defendants, concluding that the district court was wrong to conclude that an adverse inference was unwarranted as a matter of law). *See also Byrnie v. Town of Cromwell,* 243 F.3d 93, 107, 110–11 (2d Cir.2001) (observing that, "[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment," quoting *Kronisch,* stating that it then becomes a matter for the trier of fact to determine whether the documents had the content suggested by the party seeking the inference).

The missing medical record progress notes are the most problematic. Those notes, prepared by medical staff provided the most insight into how Ronald was doing and whether his mental condition was deteriorating. Any transfers to the sub-acute unit, however brief, would be noted on those notes. The notes presumably would have been available to the staff on duty the afternoon of Ronald's death. The inference that Pelletier wants the factfinder to draw is that those missing records, coupled with the other missing logs, would reveal that the staff had knowledge of Ronald's suicidal state and deliberately ignored it. That inference, however, can only be drawn against those who were actually involved in his care for the period from September 28 to October 3. Contrary to Pelletier's contentions, there is no generalized inference that can be drawn against every putative defendant because it appears that some records are missing. The missing records are only relevant as to the defendants who would have created and relied upon them during the critical time periods.

### 3. Pelletier's Argument Concerning the State Defendants' Liability

#### a. Liability of Defendants Lipman, Stewart, Bartlett, and Roach

■ Pelletier argues that Lipman should be held accountable because he was untrained and unqualified for his MHSU position. He knew that Ronald was psychotic and suicidal "the entire time he was on the unit." He was cognizant that Ronald cycled in and out of crisis quickly. He knew or should have known that Ronald had a pattern of decompensating on weekends. Furthermore, Lipman had knowledge that Ronald heard voices that told him not to talk, a symptom that should have cast doubts on Ronald's ability to "contract for safety." Pelletier further faults Lipman for allowing Ronald to be placed in an isolated cell with his belt during weekends when there were no mental health staff on the MHSU even though Ronald had not seen a medical official for two weeks[23] and had last had a Haldol

episodes. He has also produced evidence that Stewart and Bartlett knew he was highly agitated on the afternoon of his death. If the missing documents revealed further documentary evidence of Ronald's mental state and/or the responses from these front-line caregivers during the Friday and Saturday immediately preceding the death, they could provide evidence of deliberate indifference. Pelletier faces a huge burden when confronted with the accounts of Lipman, Stewart, and

Bartlett, the three people with the greatest personal knowledge of Ronald's state of mind on October 2 and 3, and the documentation that would support their accounts has gone missing. Pelletier at least should have the opportunity to test their versions of events before a factfinder.

23. Pelletier asserts that Lipman deliberately kept Ronald from seeing Doctor Tofani but does not cite the facts that support this assertion. (Pl.'s Obj. to Mots. for Summ. J. at 11.)

shot on September 15. Lipman should also have provided training or insight to the corrections officials who had sole oversight over Ronald during this time frame.

While the question of Lipman's training and experience appears to me to be largely unhelpful in determining whether there is sufficient evidence in the record that could support a finding of the constitutional violation under the existing standards, I do think that Lipman was the front-line person with the most direct control over Ronald's care. If the missing medical progress notes did indeed suggest that Tofani needed to be brought into the picture on September 29 or October 1 and Lipman refused to act on that medical recommendation, given his knowledge of Ronald's state and the medical assessments, his refusal could be considered deliberate indifference. Of course, we will never know what the medical progress notes might have revealed, but that is the point of the inference being permissible. It allows the plaintiff to get by summary judgment and puts his proof to the credibility test of a trial.

■ With respect to Bartlett and Stewart, Pelletier states that both were familiar with Ronald and with his suicidal tendencies. These officers should have been aware of the Clinical Meeting notes from September 29 that indicated that on September 28 Ronald was very anxious and hearing voices. They should have been aware, through logs and verbal communication with the officers, that Ronald had earlier instances of weekend decompensation and that this decompensation could begin with his yelling and rattling the bars. The most favorable inference, Pelletier asserts, is that these defendants knew it was Ronald rattling the bars on October

3. Stewart has testified that Pelletier was angrier than he ever saw him preceding the suicide.[24] The missing Stabilization Unit Activity Log pages are particularly relevant to these defendants because when Ronald had really bad spells notations were made in that log. Obviously if his conduct was bad enough on October 3 to warrant a note in the activity log or even a brief placement in the acute care portion of the unit (something that was done on occasion) Bartlett and Stewart would have knowledge of Ronald's state of mind that might have made their subsequent failure to properly deal with the bar rattling incident an act of deliberate indifference. Again, the inference is permitted, and without a test of credibility as to their version of the events, Pelletier has no recourse because the documentation that would support his theory (or defeat it) has gone missing.

■ The allegations concerning Roach are more tenuous. Pelletier states that Roach was the "security" member of Ronald's treatment team. As such he was to make referrals to the clinical members of Ronald's treatment team when Ronald was unstable or agitated. Pelletier asserts that Roach may be most responsible for ensuring competent care and responses from the corrections officers on nights and weekends when mental health staff were not on site and that Roach played an "integral role" in the decision to place Ronald on the stabilization corridor and allow him to have his belt. It is not clear to me how Roach played this "integral" role. Furthermore, the decision to place Ronald on the stabilization unit, in and of itself, cannot be viewed as an act of deliberate indifference. The record is replete with the

24. Pelletier asserts that Ronald would not tell the officers what his voices were commanding. The cited factual assertions do not support this contention. (Pl.'s Obj. to Motions for Summ. J. at 13.)

treatment team's goal of trying to place Ronald in the least restrictive setting. In any event Roach was not working on October 3 and did not make any decisions on that date. As with medical defendant Blake, he had been involved in the treatment team, but there is no evidence or inference that can be drawn about his responsibility for the events of October 3. The treatment team's negligence in handling Ronald's course of treatment from September 18 forward (if that is what it was) does not rise to the level of deliberate difference without some evidence of knowledge that Ronald was in serious distress on October 2 and 3.

### b. Supervisor Liability of Magnusson, Merrill, and Zubrod

Pelletier seeks to hold defendants Magnusson, Merrill, and Zubrod individually liable for an alleged failure to implement and enforce adequate suicide prevention policies and because of failures in suicide prevention training. "Gross negligence can signify deliberate indifference and serve as a basis for supervisory liability if it is causally connected to the actions that work the direct constitutional injury. Hence, inadequate training of subordinates may be a basis for a section 1983 claim against a superior officer." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 582 (1st Cir.1994) (citations omitted); *accord Cozzo v. Tangipahoa Parish Council—President Gov't*, 279 F.3d 273, 286 (5th Cir.2002).

To hold these defendants liable Pelletier must make a direct connection between the acts or omissions of these supervisory defendants and the misconduct of their subordinates. *Maldonado–Denis*, 23 F.3d at 581–83. Citing cases from other circuits, Pelletier argues that it is not neces-

sary to find that their subordinates violated Ronald's rights in order to hold these defendants liable. The First Circuit has stated otherwise:

> [D]eliberate indifference alone does not equate with supervisory liability; a suitor also must show causation. *See Maldonado–Denis*, 23 F.3d at 582 (explaining that the supervisor must have "had the power and authority to alleviate [the violation]"). In other words, the plaintiff must "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." *Id.* This affirmative connection need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct. *See id.*

*Camilo–Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir.1998). *Accord Sanville*, 266 F.3d at 740 ("[A] supervisor may be liable for 'deliberate, reckless indifference' to the misconduct of subordinates.").

With respect to Magnusson and Merrill, Pelletier asserts that they allowed officers without training to staff the MHSU. They let Doctor Zubrod take a medical leave without having determined whether he had implemented proper procedures, instituted a coherent record-keeping system, or provided training in mental health issues and suicide refreshers for the guidance of his staff. They allowed Lipman, who had no professional clinical degree to be the clinical director of the MHSU with the assistance of a LPN with no clinical education. They permitted the MHSU to go without mental health staff on the evenings and weekends. As I indicated above the educational background of Lipman was not so patently inadequate as to preclude placing him in charge of the MHSU.[25]

---

**25.** Once again, Pelletier failed to properly as- sert many of the facts regarding Lipman's

Neither the mental health staffing of the MHSU on the weekends nor the training of Stewart and Bartlett amounted to the conduct that potentially could give rise to deliberate indifference. The policies in place, known to Magnusson and Merrill, included an on-call system that would have brought a mental health worker to the scene if necessary. Furthermore the security officers on duty could have placed Ronald in the acute unit if they felt it appropriate. After all, the inference Pelletier wants the factfinder to draw from the missing records is that Ronald's behavior was so obviously a serious mental health crisis that the officers' failure to take protective measures amounted to deliberate indifference. The record is replete with occasions when Ronald had been transferred to acute care or referred to a mental health professional. The policy allowing for that action was in place. Magnusson and Merrill cannot be affirmatively connected to Lipman, Stewart, and Bartlett in terms of their misconduct (if any) regarding Ronald.

With respect to Magnusson's and Merrill's supervisory responsibilities vis-à-vis CMS, Pelletier alleges they tolerated an ethos in which financial consideration overrode treatment advice. And, they chose to permit mentally ill, suicidal inmates to be single-celled with access to materials they could utilize in a suicide attempt, such as belts and sheets. As I explain in my companion decision granting summary judgment to the medical defendants, Pelletier's theory about the "financial ethos" is just that, a theory without evidentiary support. In this case, for the reasons discussed elsewhere, the evidence does not generate an issue of material fact as to whether the employees of CMS were deliberately indifferent. It can hardly be the basis of supervisory liability against Magnusson and Merrill.

■ Regarding Zubrod, Pelletier faults him as a supervisor for his failure to implement proper procedures, institute a coherent record-keeping system, or provide training in mental health issues and suicide refreshers for the guidance of his staff prior to his taking a medical leave. Pelletier also charges him with responsibility for failing to insure that suicidal inmates not be housed in single cells with access to their belts. Pelletier further holds Zubrod accountable for going on leave without assuring that someone competent to head the MHSU was in place, rather than Lipman who was only a licensed clinical social worker. To suggest that Zubrod's conduct in this regard, however unprofessional or improper it may be seen to be by experts in the field, amounts to the constitutional violation of deliberate indifference to Ronald Pelletier's serious medical needs, turns the law of § 1983 supervisory liability as articulated by First Circuit precedent on its head.[26]

## B. Qualified Immunity

Lipman, Stewart, and Bartlett (as well as the other State defendants) do assert that, even if there is a constitutional violation, they are entitled to qualified immunity.

■ "Qualified immunity protects state actors 'from liability for civil damages inso-

---

background that he thought would advance this under-qualification argument.

**26.** Part of the confusion in this case may be that Pelletier is trying to hold Magnusson, Merrill, and Zubrod liable in their individual capacities for what is really a policy and failure to train claim best articulated in *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) and relating to municipal liability, not the liability of state supervisory officials. *See Sanville,* 266 F.3d at 739–40 (7th Cir.2001).

far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Davis,* 264 F.3d at 113 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Recently the United States Supreme Court has addressed the proper sequence for courts undertaking the qualified immunity analysis. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "A court required to rule upon the qualified immunity issue must consider," the Court stated "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id.* at 201, 121 S.Ct. 2151 (quoting *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)).

 My conclusion vis-à-vis the spoliation of evidence makes it possible for Pelletier to cross the *Saucier* threshold with respect to Lipman, Stewart, and Bartlett. As to the other state defendants, Pelletier simply does not state an Eighth Amendment claim.

Even if I concluded that "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* at 201, 121 S.Ct. 2151. This question must be framed with particularity, "in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [state actor] that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

Here the question is did Ronald have a clearly established right to have the defendants attend to his medical treatment and his housing assignment so that he was not in a state of mental health crisis and a danger to himself? Several courts have concluded that well prior to 1998 a prisoner who showed a propensity to suicide has a right to appropriate medical and security attention aimed at preventing self-inflicted harm. *See e.g., Comstock v. McCrary,* 273 F.3d 693, 711 (6th Cir.2001) ("This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known."); *see cf. Bowen,* 966 F.2d at 16 ("By 1986 it was clearly established that police officers violate the fourteenth amendment due process rights of a detainee if they display a "deliberate indifference" to the unusually strong risk that a detainee will commit suicide."). Because the deliberate indifference standard is subjective, asking whether the defendant *consciously* disregarded a substantial risk of serious harm, *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, it cannot be said that should Pelletier demonstrate that the defendants acted with a deliberate indifference to Ronald's medical care and physical safety that the defendants nonetheless reasonably believed that their conduct was lawful.

Under these facts, viewed most favorably to Pelletier at this juncture, these defendants are not entitled to qualified immunity.

### Conclusion

Based upon the foregoing, I now **GRANT** summary judgment to Magnusson, Merrill, Zubrod, and Roach and **DENY** the motion as to Lipman, Stewart, and Bartlett.

*So Ordered.*